# IN THE CIRCUIT COURT FOR THE SEVENTEETH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. _____

BYOPLANET INTERNATIONAL, LLC,
and RICHARD O'SHEA

      Plaintiffs,

vs.

CHARLES GILSTRAP,

      Defendant.

_____/

## COMPLAINT

Plaintiffs, BYOPLANET INTERNATIONAL, LLC, a Florida corporation (hereinafter "BYOPLANET"), and RICHARD O' SHEA ("O'Shea") by and through its undersigned counsel, hereby files its Complaint against Defendant, CHARLES GILSTRAP, ("Defendant"), an individual and former employee of BYOPLANET, and in support thereof alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.  Plaintiff, ByoPlanet International, LLC is a Florida limited liability company with its principal place of business located at 1305 Shotgun Road, Sunrise, Florida 33326.

2.  Plaintiff Richard O'Shea is an individual and the owner representative of ByoPlanet.

3.  Defendant Charles Gilstrap is a former Chief Financial Officer ("CFO") of ByoPlanet and, upon information and belief, is a resident of Mckinney, Texas.

4.  This Court has subject matter jurisdiction over this action because the claims asserted herein exceed $50,000.00, exclusive of interest, costs, and attorney's fees, and arise under Florida law, including but not limited to:

1

- Common law fraud

- Breach of fiduciary duty

- Breach of contract

- Conspiracy

- Negligent misrepresentation

5.   Venue is proper in Broward County, Florida, pursuant to Florida Statutes § 47.011, as the acts and omissions giving rise to this action occurred within this jurisdiction.

6.   Defendant is subject to the long-arm jurisdiction of this Court pursuant to Florida Statutes § 48.193, as he:

- Conducted business in Florida,

- Engaged in tortious acts within Florida, and

- Caused injury to Plaintiffs within Florida.

## **GENERAL ALLEGATIONS**

7.   ByoPlanet is engaged in the business of sprayer technology, Research, Development and manufacturing.

8.   Defendant Charles Gilstrap was appointed as CFO of ByoPlanet, entrusted with the financial management, accounting, and financial reporting of the company.

9.   Defendant engaged in financial mismanagement, fraud, and misconduct, leading to severe financial harm to ByoPlanet and personal damages to Richard O'Shea.

10.   As a direct and foreseeable consequence of Defendant's misconduct, a Final Judgment was entered in Canada against ByoPlanet in the amount of $6,745,787.66 CAD, and against Richard O'Shea personally for $570,467.46 CAD in attorney fees and $150,000 CAD in punitive damages. *See* **Composite Exhibit A.**

11.   Promark sold the company to ECI, a Cerberus-owned company, only nine (9) days after

contract signing, indicating premeditated fraud.

12.    Plaintiffs could not pay this outrageous contract due to an existing $6, 000,000.00 loan owed to the Clorox Company, which was due on June 1st 2021.

13.    Charles Gilstrap and Peter Johansson spent over $10, 000,000.00 in February and March, 2021 despite having no revenue stream to offset their reckless spending.

14.    Gilstrap knowingly allowed financial ruin, failed to advise the board, and willfully allowed loan repayments to become impossible.

15.    Defendant colluded with Jared Knecht to manufacture a fraudulent contract, leading to a sale at an inflated price to ECI, a Cerberus-controlled entity.

## COUNT I
## BREACH OF CONTRACT

16.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 15 as if fully set forth herein.

17.    Defendant breached his employment agreement by:

- Engaging in reckless financial mismanagement – *See* **Exhibit B** – (Supply Agreement)

- Approving fraudulent agreements without proper authority

- Concealing financial risks from the board and owners

- Failing to disclose material liabilities

## APPLICABLE CASE LAW

- Merrill Lynch v. Hagerty, 808 So. 2d 1266 (Fla. 4th DCA 2002) – Breach of contract occurs when a party fails to perform their obligations, leading to damages.

- Mason v. E. Speer & Assocs., Inc., 846 So. 2d 529 (Fla. 4th DCA 2003) – Courts uphold obligations of good faith and fair dealing within employment agreements.

WHEREFORE, Plaintiffs demand judgment for compensatory damages, attorney's

fees, and costs.

## COUNT II
## BREACH OF FIDUCIARY DUTY

18. Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 15 as if fully set forth

herein.

19. Defendant owed ByoPlanet and its owners a fiduciary duty to:

- Act with loyalty, good faith, and due care

- Disclose all material financial information

20. Defendant breached his fiduciary duty by:

- Facilitating fraudulent transactions

- Misrepresenting ByoPlanet's financial position

- Concealing material liabilities

Applicable Case Law:

- Flight Options, LLC v. Aero Toy Store, LLC, 2012 WL 1633073 (S.D. Fla. 2012) –

Fiduciary breaches occur when financial misrepresentations cause harm.

WHEREFORE, Plaintiffs demand compensatory damages, punitive damages, and attorney's fees.

## COUNT III – FRAUD & CONSPIRACY TO COMMIT FRAUD

21. Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 15 as if fully set forth

herein.

22. Defendant willfully engaged in a scheme to defraud by:

- Falsifying financial records

- Concealing financial liabilities

- Colluding with third parties to defraud ByoPlanet

Applicable Case Law:

- Raimi v. Furlong, 702 So. 2d 1273 (Fla. 3d DCA 1997) -- Fraud requires knowingly false

4

statements intended to induce reliance.

- American Honda Motor Co. v. Motorcycle Info. Network, Inc., 390 F. Supp. 2d 1170 (M.D. Fla. 2005) – Fraudulent conspiracy exists when two or more parties agree to commit fraud.

WHEREFORE, Plaintiffs demand:

- Compensatory damages exceeding $6 million
- Punitive damages
- Injunctive relief
- Pre- and post-judgment interest
- Other relief deemed just and proper

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs demand judgment against Defendant Charles Gilstrap as follows:

- Compensatory damages of $6,745,787.66 CAD
- Punitive damages for fraud and breach of fiduciary duty
- Attorney's fees and litigation costs
- Pre- and post-judgment interest
- Any other relief this Court deems just and proper.

Dated: March 3rd, 2025

Respectfully submitted,

/s/James Paul
James Paul, Esq.
Florida Bar No. 1010819
Justice Law Group, LLP
850 Southeast 8th Avenue
Fort Lauderdale, FL 33316
Telephone: (917) 562-9607
Email: Jpaul@justicelawgroup.ai

**Counsel for Plaintiffs, Byoplanet**
**International, LLC and Richard O'Shea**

6

# COMPOSITE EXHIBIT A

INSTR # 119456389
Recorded 03/18/24 at 02:26 PM
Broward County Commission
39 Page(s)
#1

# SUPERIOR COURT

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTRÉAL

No.: 500-17-118996-217

DATE: March 12, 2024

BY THE HONOURABLE ELENI YIANNAKIS, J.S.C.

PROMARK ELECTRONICS INC.

Plaintiff

v.

BYOPLANET INTERNATIONAL LLC

Defendant

This is to certify that on 3/18/24 notice of this recording was sent, certified mail, to the Debtor(s) at the addresses given in the affidavit recorded concurrently herewith.



County Administrator

Deputy

## JUDGMENT

## OVERVIEW

[1] In its Originating Application, Plaintiff, Promark Electronics Inc. ("Promark") is seeking $6,745,787.66 CAD[1] for unpaid products sold and delivered to Defendant, ByoPlanet International LLC ("ByoPlanet") in 2020. The vast majority of the amounts owing are

---

[1] $5,419,173.89 USD converted to CAD on November 11, 2021, the date of the Originating Application filed by Promark (see currency rate at Exhibit P-9).

JY0083

500-17-118996-217                                                    PAGE: 2

acknowledged by ByoPlanet in an agreement effective on May 21, 2021. Promark's claim is in essence an action on account for breach of contract or for goods sold and delivered.

[2] Despite this acknowledgement, ByoPlanet did not pay any of the amounts owing to Promark. Instead, as of August 25, 2021, for the first time, ByoPlanet invokes defects affecting Promark's products. Constituting itself Cross-Plaintiff, ByoPlanet seeks the resolution of the sale for products it did not pay for and claims $10,915,031.83 CAD[2].

[3] For the reasons that follow, the Court grants Promark's Originating Application and finds that the overwhelming factual and expert evidence reveals that there is no inherent defect in the products sold by Promark. In fact, the defect allegations are a pretext raised by ByoPlanet in order to avoid paying amounts that are clearly owing. Its Cross-Application is abusive under article 51 of the *Code of Civil Procedure* ("CCP") since it is manifestly unfounded.

## FACTS

### Genesis of the Parties' Relationship

[4]     Promark, a Quebec based company, develops, and manufactures electronic and electromechanical components[3]. It is a family-owned business founded in 1987.

[5]     The president Jarred Knecht ("Knecht")[4] took over the company in 2016 with the help of his brother, Brandon Knecht, who is Vice President – Finance & Supply Chain.

[6]     ByoPlanet is a Florida limited liability company, with offices in Athens, Georgia. Until recently, ByoPlanet developed and manufactured disinfectant delivery systems for spraying various surfaces, including a rolling cart system equipped with a nozzle (the "Rolling Cart")[5].

[7]     Rick O'Shea ("O'Shea") is the Chief Executive Officer of ByoPlanet.

[8]     Clorox Company ("Clorox") is ByoPlanet's partner[6] and principal client. Almost all of the products it manufactured, which at the time were mainly Rolling Carts, were sold to Clorox. Branded under the Clorox name as the "Clorox Total 360 Electrostatic Sprayer CLX1000"[7], Clorox sold the Rolling Carts to third parties, such as Walmart, who in turn sold the products to end-users.

---

[2]     $ 8,291,576.90 USD: see Amended Cross-Application dated December 22, 2023, par. 42 and Exhibit D-14 for the conversion rate as of September 7, 2022.
[3]     Exhibit P-1.
[4]     The use of individual's first or last names in the present judgement is only for purposes of brevity and no disrespect is intended.
[5]     See Clorox Operator's Manual for a picture of the Rolling Cart, Exhibit P-62, p. 153.
[6]     In the Clorox Proceedings, Exhibit P-13, Clorox qualifies ByoPlanet as its partner.
[7]     See Clorox Operator's Manual, Exhibit P-62, p. 153.

500-17-118996-217

[9]     In light of the Covid-19 pandemic, in 2020, its sales grew tremendously. In order to keep up with the increasing demand, on April 25, 2020, ByoPlanet executed a Supply Agreement with Promark[8]. As per the Supply Agreement, Promark agreed to deliver a series of electronic and electromechanical components to ByoPlanet, which would be incorporated into the Rolling Cart.

[10]     The components consist of three assemblies which operate together (collectively the "Assemblies") in order to provide the power supply to the Rolling Cart:

   a) the control panel assemblies, which include a power cord that is attached to the panel by a cable gland (the "Control Panels");

   b) the electrostatic power supply assemblies (the "ESPS Power Supplies");

   c) the sprayer control panel, which is the nozzle of the unit (the "ES-150 Sprayers")[9].

[11]     Promark is not ByoPlanet's first, or only supplier of the Assemblies used in the production of the Rolling Cart units. Since 2013, ByoPlanet had been working with DK International Associates Inc. ("DK"), which was manufacturing the same Assemblies. However, with the emergence of the Covid-19 pandemic, demand for disinfectant products increased so significantly, that a second supplier—Promark, was needed to meet Clorox's orders.

[12]     To that end, on October 9, 2020, Clorox loans ByoPlanet $6 M as a means to facilitate production and delivery of the units[10].

[13]     In total, over 60,000 Assemblies are sold and delivered by Promark to ByoPlanet[11]. While the numbers presented by both parties differ, the products sold represent a total amount varying between $12,5 M USD and $14,5 M USD[12], of which it is admitted that $5,982,311 USD, is outstanding as of May 2021[13].

**The Strategic Agreement and Acknowledgement of Debt**

[14]     In January 2021, ByoPlanet is seeking to transition the Rolling Cart into a backpack system, known as the "Clorox Total 360 Propack" (the "Proton Backpack")[14], where the

---

8    Exhibit P-2.
9    Exhibit P-2, section 1.
10   Exhibit P-13, par. 5.
11   Amended Cross-Application dated December 22, 2023, par. 7, 9 for the breakdown of the Assemblies sold and delivered.
12   Regarding ByoPlanet's position, see Amended Cross-Application dated December 22, 2023, par. 7.4, where the total amount of the products sold and delivered excluding freight is $ 12,509,157 USD (9,041,701 + 1,749,938 + 1,717,518) as well as Exhibits D-42, D-42A and D-43. As for Promark, the total sales amount indicated is $ 14,614,703 USD, as per Exhibit P-54.
13   Exhibits P-3 and P-52.
14   Exhibit P-3, section 2.

500-17-118996-217                                                    PAGE: 4

user could carry the disinfectant delivery system on his back, rather than roll the system on a cart. Some of the parts necessary for the backpack model are the same as the Rolling Cart, but others not, so a transition to this new product must be discussed and agreed upon.

[15]     Knecht begins discussions regarding the Proton Backpack with Peter Johansson ("Peter"), president, and Chief Operating Officer of ByoPlanet at the time. These discussions continue over several months and also involve Kyle Robinson, Director of Supply Chain and Charles ("Chuck") Gilstrap ("Gilstrap"), Chief Financial Officer of ByoPlanet.

[16]     The parties also agree that the amounts owing to Promark at the time should be included in the new agreement that will be signed. To this end, between February and April 2021, the parties' accounting teams have several exchanges to ensure that the accounts are properly reconciled as to the final amount owing to Promark[15].

[17]     On May 21, 2021, the parties execute the Strategic Manufacturing and Supply Agreement (the "Strategic Agreement") which is signed by Gilstrap for ByoPlanet and Knecht on behalf of Promark. The Strategic Agreement provides for the transition to the Proton Backpack and ByoPlanet's formal acknowledgement that it owes $ 5,982,311 USD to Promark (the "Outstanding Amount"). In this regard, the Strategic Agreement lays out a payment plan, whereby ByoPlanet agrees to pay the Outstanding Amount in 29 installments[16] commencing on June 18, 2021, until December 31, 2021[17].

[18]     At the time of the execution of the Strategic Agreement, of the 60,000 Assemblies sold and delivered to ByoPlanet, 23,349 have already been incorporated into Rolling Carts sold to Clorox and are currently in the field[18]. ByoPlanet was fully paid by Clorox for these products[19]. The only existing log of returned items reveals that from June 2020 to April 2021, only 50 units were returned to Promark for various issues ranging from missing serial numbers, pump not rotating, and the unit won't turn on. This represents approximately 2% of the units sold to Clorox[20]. These were all deemed minor issues, and the parties collaborated to resolve them.

[19]     Moreover, in March 2021, ByoPlanet starts receiving complaints notably from Walmart regarding damage to the power cord[21]. In this regard, ByoPlanet has some exchanges with Clorox, where it is found that user error could cause damage to the power cord, if the user pulls the Rolling Cart from the cord (a.k.a. the" Pigtail") rather than from

---

[15]   Exhibit P-11.
[16]   Section 7.4 of Exhibit P-31 indicates 31 installments, but there is a typo, it is in reality 29 installments.
[17]   Exhibit P-3, section 7.4.
[18]   Amended Cross-Application dated December 22, 2023, par. 9.
[19]   Exhibit P-26, pp. 139-140.
[20]   Exhibit P-18; 50 returned units + 23,349 sold units x 100 = 2 %.
[21]   Exhibits D-3 and D-4.

500-17-118996-217                                                            PAGE: 5

the handle[22]. It is agreed that a "strain relief hook"[23] and an installation video would be distributed to customers[24]. Thereafter, ByoPlanet's internal report dated August 31, 2021, confirms that the incident rate drops significantly—a monthly chart from March to August reveals that there were less than five incidents reported regarding damage to the power cord in July and August 2021[25].

### Failed Attempt to Set Aside the Strategic Agreement

[20]    On July 20, 2021, Knecht writes to Gilstrap and O'Shea stating that they need to speak since the payment plan outlined in the Strategic Agreement has not been respected[26]. Indeed, the five first payments provided therein had not been made. Approximately 10 minutes later, O'Shea responds that "Peter" has been terminated and the Strategic Agreement had not been approved by the board[27]. Knecht answers that the Strategic Agreement had been negotiated with several members of the ByoPlanet team over many months and had been duly executed[28]. He expects ByoPlanet to abide by its obligations.

[21]    O'Shea's response is baffling. "Peter" did not sign the Strategic Agreement on behalf of ByoPlanet, Chuck Gilstrap did. Moreover, O'Shea's testimony on whether he actually sought approval from the board regarding the Strategic Agreement is contradictory. In his pre-trial examination, he claims that he did, "through a quick phone call"[29]. At trial, he contradicts his previous statement, maintaining that he only learned of the agreement sometime in June 2021.

[22]    O'Shea contradicts himself yet again when addressing the reasons for the first unpaid installments. In his pre- trial examination, he testifies that the first payment due on June 18, 2021, was not paid since "all payments were put on hold until further research was done on the Boards"[30]. However, at trial, he admits that the first payments should have been made, since he acknowledges that it was in August 2021 that ByoPlanet truly became aware of the alleged seriousness of the defect issue.

[23]    In actuality, none of ByoPlanet's witnesses were able to offer any explanation as to why the five first payments provided under the Strategic Agreement (due on June 18, June 25, July 2, July 9, and July 16, 2021) totaling $ 400 000 USD were not paid. O'Shea contends that ByoPlanet had the liquidities at the time to cover them. However,

---

[22]  Exhibit D-27, P-28, and P-29; see also Exhibits D-28 and P-30, exchanges between ByoPlanet and Clorox regarding procedures to put in place on how to properly service Walmart.
[23]  See Exhibit D-27 for a photo of the strain relief hooks.
[24]  Exhibits D-11, P-29, and D-27.
[25]  Exhibit D-11, pp. 1, 3.
[26]  Exhibit P-4.
[27]  Exhibits P-16 and D-19.
[28]  Exhibit D-19.
[29]  Exhibit P-26, pp. 50-51.
[30]  Exhibit P-26.

500-17-118996-217

PAGE: 6

ByoPlanet's bank statements reveal a balance of $ 336,503.76 USD as of August 31, 2021, showing that cash flow availability was actually limited[31].

[24]    Clearly, this was an attempt by O'Shea to set aside the Strategic Agreement. O'Shea testified that when he learned of the existence of this agreement around June 2021, he was "livid". He felt that Peter, a friend since high school, who had participated in the negotiations, had betrayed him by going behind his back.

[25]    Following O'Shea's failed attempt to set aside the Strategic Agreement, the parties agreed that an initial payment of $ 50 000 USD would be made to Promark on July 26 or 27, 2021[32].

[26]    Rather than make the payment, on July 28, 2021, ByoPlanet's external council sends Promark an email asking to set up a call to "address your concerns"[33].

[27]    On August 3, 2021, Promark sends a formal letter of demand signed by its attorneys asking for the payment of the Outstanding Amount and the termination of the Strategic Agreement[34]. This letter was never answered.

**"Defective Product Discovery"**

[28]    Suddenly and unexpectedly, on August 25, 2021, Steve Cooper ("Cooper"), Vice-president of Research & Development at ByoPlanet, informs Promark in a short email, that it has discovered "serious issues" with the Control Panels[35].

[29]    He states that ByoPlanet has received multiple complaints of power cord failures and that this results in an "inoperable machine and causes a safety hazard". No supporting documentation is provided. Instead, Cooper indicates that "further analysis" is needed to determine whether a full repair and replacement of all the units will be required:

> (...) We have received multiple complaints of power cord failures that have been characterized by splitting of the outer insultation or broken wires inside the power cord. This results in an inoperable machine and a safety hazard. Our initial, ongoing investigation has shown that the panel-mounted fitting used to hold the power cord is excessively deforming the cord. (...) We are also seeing that when this condition is combined with cold weather there is a high incidence of failure of the cord's insulated sheath or internal wires.

---

[31]    O'Shea refers to Exhibit P-31 which are ByoPlanet's redacted bank statements, and specifically to the one on page 21, which shows a balance of $ 336,503.76. The other bank statements that were filed are for the months of June and July 2021.

[32]    Exhibit P-5.

[33]    Exhibit P-6.

[34]    Exhibit P-7.

[35]    Exhibit P-17.

> (...) Based on inspections and testing, BYP concludes that the Control Panels supplied by Promark are defective and not fir for their intended use such that the manufacturing process employed by Promark will need to be revised accordingly. Further analysis and discussion is required to determine if a full repair and replacement of all existing units will be required. (...)[36]

[Emphasis added]

[30]    Cooper testified that he fortuitously found out about the alleged defects in August 2021, when he glanced at a Control Panel lying on a desk while in the R&D department. He stated that he was in charge of the root cause analysis "by default" which is an indication of the less than thorough analysis carried out by ByoPlanet in this instance.

[31]    In fact, prior to sending this email, ByoPlanet conducted limited testing on the Control Panels, which did not reveal any inherent defect[37]. From the evidence filed, there is only one comprehensive report dated August 31, 2021, which outlines the results of ByoPlanet's root cause analysis[38]. It is the same report that states that the reason for the power cord failures identified from March to August 2021 is user error and was solved with the addition of strain relief hooks[39].

[32]    There is no evidence of a formal written notice provided to Clorox by ByoPlanet of this allegedly serious defect issue, despite a contractual obligation to do so[40]. The only piece of evidence put forward by ByoPlanet is Cooper's meeting notes with Clorox for August 19, 2021, where one of the indicated discussion points is to "determine potential need for recall, or field repair of units"[41]. Cooper also spoke with Clorox of this issue on August 24, 2021, and understood that Clorox was not going to remove, recall of withdraw any of the Promark products[42].

[33]    Finding the August 25th email bizarre and suspicious in a context where important amounts are still outstanding, Promark does not respond. ByoPlanet never notifies Promark of any results of a "further analysis", Promark is not afforded the opportunity to "repair or replace" the supposedly defective Control Panels, nor is it informed of Clorox's position on this matter[43].

---

[36]   Exhibit P-17.
[37]   Exhibit D-6, testing conducted on August 18, 2021. The other testing conducted was on September 8, 2021 (Exhibit D-10) and on October 6, 2021 (Exhibit D-12).
[38]   Exhibit D-11.
[39]   Exhibit D-11.
[40]   Exhibit D-46, section 5.2 a).
[41]   Exhibit D-8.
[42]   Exhibit D-9; Amended Cross-Application dated December 22, 2023, par. 23.
[43]   Exhibit P-27, U-10.

500-17-118996-217                                                          PAGE: 8

[34]    Instead, and despite Clorox's position, on September 9, 2021, Sean Corrigan ("Corrigan"), Director of Operations at ByoPlanet sends another email to Promark advising it that it will be:

   a)  shipping back 32,618 of inventory of the Assemblies that have not been incorporated into any finished units;

   b)  reworking 7,049 of Assemblies in inventory that have been incorporated into finished products but not sold; and

   c)  reworking 25,138[44] Assemblies currently in units in the field as they are returned[45].

[35]    The total costs claimed by ByoPlanet, which include the purchase price of the Assemblies is approximately $ 6.8 M USD[46].

[36]    However, even though ByoPlanet is asking for the "reimbursement" of the purchase price, in reality, ByoPlanet has not paid Promark for these Assemblies, or at least it admits that it has not paid for the majority thereof. While Promark contends that none of these Assemblies have been paid for, ByoPlanet admits that it did not pay for 20,320 of the 32,618 units held in inventory[47].

**Termination of Clorox Relationship and Cash Flow Problems**

[37]    During this same period and unbeknownst to Promark, ByoPlanet's relationship with Clorox is also starting to deteriorate. On July 29, 2021, Clorox institutes proceedings against ByoPlanet alleging breach of contract and a default on the repayment of the $6M loan (the "Clorox Proceedings")[48]. On December 20, 2021, Clorox and ByoPlanet agree to terminate their relationship (the "Wind Down Agreement")[49] and settle the Clorox Proceedings[50].

[38]    According to O'Shea's testimony, the last order received from Clorox is in February 2021 for approximately 10,000 Rolling Cart units. Clorox paid for this order upfront and in full[51].

[39]    There is no mention of any defective products in either the Clorox Proceedings or in the Wind Down Agreement. In fact, there is no evidence adduced at trial regarding any

---

[44]  In its Cross-Application, the number indicated is 23,349 Control Panels in the field, par. 9.
[45]  Exhibit P-19.
[46]  Exhibit P-19: $ 6,730,158.10 + $ 140,980 + $ 502,760 = $ 6,871,640 USD.
[47]  Exhibit P-27, U-41: ByoPlanet admits to having paid for 12,298 of the 32,618 Control Panels, leaving 20,320 unpaid units. It contends having paid for the 23,346 that are in the field and the 7,049 Control Panels incorporated in units but still held in inventory.
[48]  Exhibit P-13.
[49]  Exhibit D-45.
[50]  Exhibits D-29 and D-44.
[51]  Exhibit P-13, par. 40.

complaints or concerns from Clorox about defective units, returned products or any recall of the Rolling Carts by Clorox.

[40]    In addition to the Clorox Proceedings, again during the same period, on July 15, 2021, ByoPlanet is facing a lawsuit from one of its major suppliers Gast Manufacturing Inc. ("Gast") for breach of contract and for unpaid invoices, claiming $ 1.8 M USD (the "Gast Proceedings")[52]. The Gast Proceedings are settled on February 27, 2023[53].

[41]    As of the summer of 2021, ByoPlanet is experiencing serious cash flow problems. From September 9, 2021, to September 19, 2022, ByoPlanet borrows $ 6 M USD (the "Loan Agreement")[54] from RPMOS LLC, a Florida limited liability company ("RPMOS")[55]. However, despite numerous contradictions in O'Shea's testimony on this issue[56], the evidence reveals that RPMOS does not have a bank account and so the monies are actually advanced by its members[57], O'Shea and John Barrett[58]. Based on O'Shea's testimony, John Barrett holds 33 % equity and O'Shea 67 % in RPMOS. O'Shea is the only "Authorized Person" listed on RPMOS' corporate registry[59].

[42]    The Loan Agreement is secured by a Security Agreement dated September 9, 2021, pursuant to which ByoPlanet grants a security interest in almost all of its assets. RPMOS is essentially ByoPlanet's only secured creditor[60].

[43]    Following ByoPlanet's failure to repay the loan, on February 17, 2023, RPMOS demands immediate repayment of the loan[61]. RPMOS executes a foreclosure on all of ByoPlanet's assets, save for the claim in the Cross-Application and all of the inventory supplied by Promark which is still being held by ByoPlanet[62].

**Good Salt Transaction**

[44]    Thereafter, on May 10, 2023, RPMOS enters into an asset purchase agreement with Good Salt LLC ("Good Salt") pursuant to which Good Salt, a company incorporated

---

[52]  Exhibit P-20. See also, Exhibits P-21 and P-22.
[53]  Exhibit D-30.
[54]  Exhibit D-31.
[55]  Exhibit P-40.
[56]  In his first pre-trial examination held on October 4, 2022, O'Shea, states that he personally loaned ByoPlanet funds as of late December 2021 (P-26, pp. 117-118). In his second pre-trial examination held on November 13, 2023, he testifies that he did not loan ByoPlanet any funds, maintaining that despite the fact that RPMOS has no bank account, it still "loaned" the monies to ByoPlanet (P-26A, pp. 11, 59).
[57]  A member is the equivalent of a shareholder.
[58]  Exhibit D-32, which are redacted bank account statements showing the advances from the two members.
[59]  Exhibit P-40. However, the members are not listed.
[60]  Exhibit D-33. There are two other secured creditors, but on specific pieces of equipment.
[61]  Exhibits D-34 and D-34A.
[62]  Exhibit D-35. There was a debate as to whether the Promark inventory was excluded or not from the transaction, but this issue is not relevant to deciding the case.

only five months earlier[63], acquires all of ByoPlanet's transferred assets (but none of its liabilities) for $ 250 000 USD (the "Good Salt Transaction")[64].

[45]    In his testimony, O'Shea confirms that ByoPlanet is no longer operating and has no employees, most of which have been hired by Good Salt[65].

[46]    Essentially, Good Salt is the successor in interest to the vast majority of ByoPlanet's assets. O'Shea is Good Salt's president and RPMOS its agent[66]. Also, Good Salt, RPMOS and O'Shea all have the same registered address[67].

[47]    On May 16, 2023, Good Salt enters into a share exchange and reorganization agreement with Plandai Biotechnology Inc. ("Plandai"), whereby Plandai is set to acquire all of the issued and outstanding interests in Good Salt (shares and assets)[68]. Plandai is a publicly traded company based in London, United-Kingdom.

[48]    On July 31, 2023, Plandai rescinds the agreement, thereby rendering it null and void[69].

## PROCEDURAL HISTORY

[49]    On November 12, 2021, Promark files its Originating Application, which is modified on three occasions thereafter[70], seeking the recovery of $ 5,419,173.89 USD broken down as follows:

   a) The Outstanding Amount, $ 5,982,311 USD as per section 7.4 of the Strategic Agreement;

   b) $ 749,362.89 USD for work in progress as per section 15 *in fine* of the Strategic Agreement[71];

   c) The whole net of a security deposit held by Promark of $ 1,312,500 USD.

   Total: $ 5,419,173.89 USD

---

[63]  Exhibit P-37. Good Salt was incorporated on December 9, 20222.
[64]  Exhibit D-37.
[65]  Exhibit P-26A, pp. 50-53. O'Shea, Cooper, and Corrigan all began their testimony by stating they worked for Good Salt.
[66]  Exhibit P-37.
[67]  Exhibits P-37, P-40, and P-41. The registered address is: 175 Royal Palm Drive, Fort Lauderdale, Florida.
[68]  Exhibit P-32. See also Exhibit P-48 (PU-1fA)—subject to a publication ban (see section 5 of the present Judgement).
[69]  Exhibit D-38.
[70]  The most recent version of the Originating Application is on November 22, 2023.
[71]  Exhibit P-8.

[50]    On February 7, 2022, and then on September 9, 2022, ByoPlanet files its Summary Statement of Oral Grounds of Defence ("Defence") and its Cross-Application, both of which are modified several times thereafter[72].

[51]    ByoPlanet does not contest the amounts claimed, nor the validity of the Strategic Agreement and the Outstanding Amount. Rather, it invokes defects in Promark's products and ultimately argues that it is justified not only to refuse to pay for the Assemblies but also claims in its Cross-Application $ 8,291,576.90 USD[73], which consists of the purchase price and damages resulting from the alleged defects.

[52]    On December 15, 2022, the parties file a Request for Setting Down for Trial and Judgement by way of a Joint Declaration. On March 9, 2023, the parties set the dates for a 4-day trial which is held on December 11 to 14, 2023.

[53]    On April 18, 2023, upon learning of the Good Salt and Plandai transactions through press releases, Promark modifies its Originating Application and adds Good Salt as a new Defendant, which is contested by ByoPlanet. On November 2, 2023, Justice Daniel Urbas hears Promark's Application for Authorization to Amend its Originating Application and renders his oral judgement on November 3, 2023. He allows the amendments and additional exhibits sought by Promark but refuses the addition of Good Salt as a Defendant. He also allows ByoPlanet to modify its proceedings to respond to the new allegations and exhibits as well as the conduct of a new pre-trial examination of O'Shea and the communication of undertakings.

[54]    At the outset of the trial, the parties argued an Amended Application for a Sealing Order dated November 21, 2023, and an Application for Confidentiality and Sealing Orders dated December 4, 2023, presented by ByoPlanet (collectively the "Confidentiality Application"). The Court took the Confidentiality Application under advisement and will address it in this judgement.

## PARTIES' POSITIONS

**Promark's Position**

[55]    Promark argues that its Originating Application is straightforward. The Strategic Agreement contains an acknowledgement of debt, which is the equivalent to an extrajudicial admission. It is simply asking to be repaid the amounts owing as per the uncontested acknowledgement of debt and the Strategic Agreement.

---

[72]    The most recent versions of the Defence and Cross-Application are dated December 22, 2023.

[73]    Using the conversion rate at Exhibit D-14, this represents $10,915,031.83 CAD.

500-17-118996-217                                                      PAGE: 12

[56]    Promark further contents that ByoPlanet is acting in bad faith in invoking alleged defects to the products sold and delivered, which is a pretext to avoid paying monies that are clearly owed.

[57]    From a purely legal point of view, Promark argues that ByoPlanet cannot ask for the resolution of the sale and the "reimbursement" of a purchase price for products it has not paid for. This is nonsensical and demonstrates that the Cross-Application is baseless. It is asking the Court to declare the Cross-Application abusive within the meaning of articles 51 and following of the CCP[74].

[58]    On the issue of the alleged defects, it points out that there is not a shred of evidence that the 23,000 plus units that were sold to Clorox and are currently in the field have had any significant issues. Moreover, nearly three years later, there have been no safety issues or hazardous incidents reported, no log of items returned (save for the 50 units)[75] and no recall by Clorox. No evidence that the units are inoperable and need to be repaired or replaced. There are barely any written communications with Clorox relating to this issue[76].

[59]    To add insult to injury, ByoPlanet's own root cause analysis report dated August 31, 2021, reveals that the power wire failures are due to user error and to the Pigtail being overly pulled[77]. The report confirms that once cable pulls also called "strain relief hooks"[78] are distributed to customers, the incident rate drops significantly. Promark's expert also corroborates this finding[79].

[60]    Lastly, Promark argues that ByoPlanet's bad faith is further evidenced when one analyzes the Good Salt Transaction, which reveals ByoPlanet's ultimate objective to make itself judgement proof.

**ByoPlanet's Position**

[61]    ByoPlanet contends that although the timing of the discovery of the defects is not ideal, said defects exist, are confirmed by its engineering team[80] and by its experts[81]. It argues that its expert evidence shows that the gland connecting the cable to the Promark Control Panel is overtightened, a feature that is completely absent on the comparable DK panels. This defect creates an over compression and causes damage to the cable which

---

[74]   Amended Oral Grounds of Defence to ByoPlanet's Amended Cross-Application, dated November 21, 2023.

[75]   Exhibit P-18.

[76]   Exhibits D-7, D-8 and, D-9. As already stated, there are other communications regarding power cord issues where it is determined that user error was the cause: Exhibits D-27, D-28, P-28 to P-30. Some of these exhibits contain duplicates.

[77]   Exhibit D-11.

[78]   See Exhibit D-27 for a photo of the strain relief hooks.

[79]   Exhibit P-62.

[80]   Exhibits D-5 to D-11.

[81]   Exhibit D-17.

500-17-118996-217                                        PAGE: 13

could pose electrical safety hazards. Thus, Promark's Control Panels are defective. Since the Assemblies all operate as a unit, all of Promark's products are unusable.

[62]    It argues that Promark violated its obligation to warrant that the Control Panels it supplied were free from defects and could be used for their intended purpose under articles 1726 and 1729 of the *Civil Code of Quebec* ("CCQ"). As such, considering the defect of the Control Panels supplied by Promark, ByoPlanet is entitled to the resolution of their sale and to the restitution of the purchase price, or subsidiarily, it is entitled to invoke the exception of non-performance. ByoPlanet is also entitled to damages equivalent to the purchase price paid to Promark for the ESPS Power Supplies and the ES-150 Sprayers, which are being held by ByoPlanet as unusable inventory.

[63]    To the extent that ByoPlanet is ordered to pay Promark any of the amounts claimed in the Originating Application, ByoPlanet is entitled to seek judicial compensation between the said amount, on the one hand, and the purchase price of the Control Panels and damages, on the other hand, to be paid by Promark.

[64]    Finally, regarding the Good Salt Transaction, ByoPlanet argues that it is absurd to think that all of the steps taken leading up to this transaction were for the sole purpose of frustrating Promark, should it obtain a favorable judgement. It argues that ByoPlanet had cash flow issues that it attempted to resolve, but in the end was unsuccessful.

## ISSUES IN DISPUTE

[65]    The Court must decide the following issues:

1. Is Promark's Originating Application well founded?

2. Are Promark's products defective?

   More specifically:

   a) Has ByoPlanet proven a loss of use of Promark's products in order to establish a presumption of liability in its favor?

   b) If not, has ByoPlanet established that Promark's products are otherwise defective?

3. If not, was ByoPlanet acting in bad faith?

4. Is ByoPlanet's Cross-Application an abuse of process?

5. Is ByoPlanet's Confidentiality Application well-founded?

500-17-118996-217                                                                   PAGE: 14

## ANALYSIS

### 1.    IS PROMARK'S ORIGINATING APPLICATION WELL FOUNDED?

[66]    The source of Promark's claim is the Strategic Agreement. This agreement clearly provides that the amounts claimed are due by ByoPlanet.

[67]    Regarding the Outstanding Amount, the Court finds that the Strategic Agreement contains an acknowledgement of debt by ByoPlanet at section 7.4. An acknowledgement of debt constitutes an extra-judicial admission and serves as evidence against its author[82], namely, ByoPlanet. It can only be revoked if an error vitiating consent is proven[83].

[68]    Here, although O'Shea attempted to cancel the Strategic Agreement on July 20, 2021, in its proceedings and at trial, ByoPlanet did not contest the validity of the acknowledgement of debt, nor did it invoke any error which could have vitiated its consent[84]. The Outstanding Amount is due.

[69]    Regarding the amount of $ 749,362.89 USD for work in progress, section 15 *in fine* of the Strategic Agreement provides that the termination of the Agreement does not relieve the parties of its obligation to pay for any raw materials or work in progress (WIP) that remains unpaid. The invoice for the amount claimed was issued on June 18, 2021, prior to the termination of the Strategic Agreement, was uncontested by ByoPlanet and remains unpaid[85]. This amount is also due.

[70]    After deducting the security deposit held by Promark of $ 1,312,500 USD, the Court finds that Promark is entitled to the sum of $ 5,419,173.89 USD. Applying the conversion rate as of the date of the institution of the Originating Application, November 11, 2021, the amount owed by ByoPlanet to Promark is $ 6,745,787.66 CAD[86].

[71]    Section 7.4 of the Strategic Agreement provides that all outstanding amounts will bear annual interest at a rate of 5% plus current prime. The annual prime rate of the Bank of Canada on November 11, 2021, was 2.45 %, so that the applicable conventional interest is 7.45 % per annum[87].

[72]    As such, the Court finds that Promark is entitled to recover the sum of $6,745,787.66 CAD plus interest at a rate of 7.45 % per annum.

---

[82]    *Droit de la famille—153636*, 2015 QCCS 6706, par. 4, 9,18; *Hivon* v. *3039510 Canada inc. (Services financiers Diane Gagné*, 2016 QCCS 1406, par. 107.
[83]    *Hivon* v. *3039510 Canada inc. (Services financiers Diane Gagné)*, 2016 QCCS 1406, par. 107.
[84]    Exhibit P-26, pp. 52-53.
[85]    Exhibit P-8.
[86]    Exhibit P-9, the conversion rate for USD →CAD is 1.2448.
[87]    Exhibit P-10.

[73]    However, ByoPlanet argues that it is justified in refusing payment since Promark's products are defective.

[74]    While Promark contests this assertion, its preliminary argument is that ByoPlanet is barred from presenting this claim, since the Supply Agreement was replaced by the Strategic Agreement, and therefore no longer has any effect. It argues that since the Supply Agreement was terminated, the warranty obligations attached to the Assemblies sold can no longer be invoked.

[75]    The Court does not agree. Even though the Supply Agreement was "updated "[88] by the Strategic Agreement, Promark's warranty obligations still survive under the Supply Agreement for the products already sold and delivered. One of the conditions to invoke warranty obligations is that the latent defect must have existed at the time of the sale[89]. As such, whether a contract was replaced or terminated has no impact on the continued existence of the warranty obligations[90].

[76]    Nevertheless, for ByoPlanet's argument to be successful, it must prove that Promark's products are affected by a latent defect.

## 2.    ARE PROMARK'S PRODUCTS DEFECTIVE?

### 2.1 Legal Principles

[77]    Pursuant to articles 1716 and 1726 CCQ, the seller is bound to warrant the buyer that the property, at the time of the sale is free of latent defects that render it unfit for the use for which it was intended or that so diminish its usefulness that the buyer would not have bought it or paid so high a price had they been aware of the defect.

[78]    A buyer seeking to invoke the warranty of quality must necessarily establish that the alleged defect (i) is latent, (ii) is sufficiently serious, (iii) existed at the time of the sale, and (iv) was unknown to the buyer[91].

[79]    The buyer who discovers a latent defect must also comply with article 1739 CCQ and provide the seller with a timely notice outlining the discovered defects[92].This is a substantive requirement, so that in order to succeed on its warranty claim, a buyer must not only prove the criteria outlined above but must also demonstrate that he provided timely notice of the latent defect[93].

---

[88]    See third paragraph of the preamble of the Strategic Agreement, Exhibit P-3.
[89]    *ABB Inc.* v. *Domtar Inc.*, 2007 SCC 50, par. 50.
[90]    *ABB Inc.* v. *Domtar Inc.*, 2007 SCC 50, par. 50; see also article 1606 al. 2 CCQ and *Beaulne* v. *Valeurs mobilières Desjardins inc.*, 2013 QCCA 1082, par. 9.
[91]    *ABB Inc.* v. *Domtar Inc.*, 2007 SCC 50, par. 50.
[92]    *Claude Joyal inc.* v. *CNH Canada Ltd.*, 2014 QCCA 588, par. 24, 28.
[93]    *Cvesper* v. *Melatti*, 2023 QCCA 1545, par. 12, 13.

500-17-118996-217                                                                    PAGE: 16

[80]    The starting point of this analysis is the existence of an actual defect[94]. The main purpose of the legal warranty aims to provide the buyer with the usefulness and full use of the sold property. The CCQ defines a defect as a flaw that renders the property unfit for its intended use[95].

[81]    There are three main types of latent defects: (i) the material defect, which relates to a specific good that was for example broken upon delivery; (ii) the functional defect, which relates to the good's design; and (iii) the conventional defect, which arises where the buyer has disclosed that the good is to be put to a particular use[96]. Regarding the functional defect, which is at issue here, such a defect will be established if the good cannot partially or totally perform its intended use regardless of the cause while applying an objective standard[97].

[82]    In assessing whether the defect is sufficiently serious, the defect does not have to render the good completely unusable but simply has to reduce its usefulness significantly in relation to the legitimate expectations of a prudent and diligent[98].

[83]    While the occurrence of an actual material prejudice is not required, it is necessary to prove the existence of a likely risk of prejudice or a deficit in the usefulness of the defective product:

> [88] A defect will be considered to be serious if it renders the good unfit for its intended use or so diminishes its usefulness that the buyer would not have bought it at the price paid (arts. 1522 C.C.L.C. and 1726 C.C.Q.). An example frequently cited by the authors is where a house is at risk of water damage owing to a crack in its foundation. The crack does not actually have to cause such damage for a latent defect to exist; it is enough that the crack exists and that it is likely to lead to serious damage.
>
> [89] C.E. considers only the first aspect of the seriousness of the defect. According to its interpretation, the boiler could not be considered to be defective unless there were absolutely no possibility of it working. The trial judge, too, failed to ask whether the usefulness of the good had been diminished, as he stressed that the recovery boiler could continue to operate despite the cracks. [99]

                                                                   [Emphasis added]

---

[94]   *Media Graph Dépôt inc.* v. *Mtex Solutions*, 2021 QCCS 5206, par. 38, 40.
[95]   Article 1726 CCQ; *Ville de Gatineau* v. *1561660 Ontario Ltd.*, 2023 QCCS 4242, par. 70.
[96]   *ABB Inc.* v. *Domtar Inc.*, 2007 SCC 50, par. 48.
[97]   *Ville de Gatineau* v. *1561660 Ontario Ltd.*, 2023 QCCS 4242, par. 72.
[98]   *ABB Inc.* v. *Domtar Inc.*, 2007 SCC 50, par. 52.
[99]   *ABB Inc.* v. *Domtar Inc.*, 2007 SCC 50, par. 88, 89; *3223701 Canada inc.* v. *Darkallah*, 2018 QCCA 937, par. 27 and 28. The Court will use the terms "likely risk" since these are the terms used by the Supreme Court of Canada in *ABB* v. *Domtar*. The French terms used are "*risque probable*".

[84]    In principle, the burden of proof rests with the buyer who is invoking a latent defect[100]. However, in the case of a professional seller, a presumption of liability can be set up in favour of the buyer if he establishes that the property malfunctioned or deteriorated prematurely in comparison with identical property or property of the same type[101].

[85]    Once established, this presumption of liability includes: (i) a presumption that there was a latent defect in the product, (ii) a presumption that the defect existed at the time of the sale, and (iii) a presumption that the defect caused the premature malfunction or deterioration of the product and is thus serious[102].

[86]    In essence, if the presumption applies, three out of the four criteria are thus presumed and there is a reversal of the burden of proof such that it is incumbent upon the professional seller to demonstrate, on a balance of probabilities, that the malfunction or premature deterioration resulted from (i) improper use by the buyer, (ii) the fault of a third person, or (iii) superior force[103].

[87]    The key factor in this analysis resides in the loss of use, as assessed in light of the buyer's reasonable expectations[104]. Bottom line, in the case of a professional seller, the starting point of the analysis should be to determine whether there is a loss of use, in other words whether the buyer established a malfunction or the premature deterioration of the product, in order to determine whether the presumption of liability applies.

[88]    Here, Promark is clearly a professional seller and ByoPlanet is alleging a functional defect and a significant loss of use, since it claims that the defect renders the Control Panels provided by Promark inoperable, unfit for their intended purpose and poses an electrical hazard[105].

[89]    On one hand, if ByoPlanet proves a loss of use, the presumption of liability applies and it is up to Promark to rebut the presumption, which it can do by notably proving improper use by the end-user. On the other hand, if ByoPlanet fails to prove a loss of use, the presumption of liability does not apply, the burden rests with ByoPlanet to prove that the Control Panels are defective.

[90]    As such, the Court will tackle the following sub-questions:

---

[100]  Article 2803 CCQ; *Ville de Gatineau* v. *1561660 Ontario Ltd.*, 2023 QCCS 4242, par. 73.
[101]  Article 1729 CCQ; *CNH Industrial Canada Ltd.* v. *Promutuel Verchères, société mutuelle d'assurances générales*, 2017 QCCA 154, par. 28. There is a similar presumption provided for at article 1730 CCQ regarding a manufacturer's liability.
[102]  *CNH Industrial Canada Ltd.* v. *Promutuel Verchères, société mutuelle d'assurances générales*, 2017 QCCA 154, par. 28; *CCI Thermal Technologies Inc.* v. *AXA XL*, 2023 QCCA 231, par. 43.
[103]  *Demilec inc.* v. *2539-2903 Québec inc.*, 2018 QCCA 1757, par. 44 to 47.
[104]  *ABB Inc.* v *Domtar Inc.*, 2007 SCC 50, par. 49; *Ville de Gatineau* v. *1561660 Ontario Ltd.*, 2023 QCCS 4242, par. 76.
[105]  Exhibit P-17.

500-17-118996-217                                                          PAGE: 18

a) Has ByoPlanet proven a loss of use of Promark's products in order to establish a presumption of liability in its favor?

b) If not, has ByoPlanet established that Promark's products are otherwise defective?

### 2.2 Has ByoPlanet Proven a Loss of Use of Promark's Products in order to Establish a Presumption of Liability in its Favor?

[91]     On this issue, the Court will first examine the evidence in order to determine whether ByoPlanet has established an *actual* loss of use, and if not, whether it has proven the existence of a *likely risk* of a deficit in the usefulness Promark's products.

### 2.2.1   Actual Loss of Use

[92]     The question as to whether ByoPlanet has proven an actual loss of use of the Promark Control Panels entails a purely factual analysis. The Court must analyze the evidence which supported ByoPlanet's claim at the time of the alleged discovery. The relevant period is from March 2021, the time where ByoPlanet alleges having received complaints regarding damaged power cords[106] up until September 9, 2021, where it informs Promark that it will return all defective parts held in inventory and rework the ones already incorporated into units and the ones in the field[107].

[93]     Moreover, since there are over 23,000 Rolling Cart units in the field incorporating the alleged Promark defective Control Panels, the other relevant period that must be considered is the current lifespan of the products, which is from approximately June 2020[108], the date the products were first delivered until the trial date, December 2023.

[94]     ByoPlanet's expert evidence, while potentially relevant to establishing the existence of a *likely* risk of a usefulness deficit, is not helpful in determining an actual loss of use since this aspect was not addressed in the report filed[109].

[95]     The Court finds that the evidence does not establish any actual loss of use of Promark's products, nor any reasonable grounds to state that the alleged defect caused the Control Panels to be inoperable, pose a safety hazard or render them unfit for their intended purpose, as alleged by ByoPlanet in its email dated August 25, 2021[110].

[96]     First, although the evidence shows complaints received by Walmart regarding power cord failures[111], ByoPlanet did not keep a specific and contemporaneous log of the

---

[106]  Exhibits D-3 and D-4.
[107]  Exhibit P-19.
[108]  The Court relies on Exhibit P-18, the only Return Log of the 50 items, which reveals returns as of June 2020, so that the products must have been delivered shortly before.
[109]  Exhibit D-17.
[110]  Exhibit P-17.
[111]  Exhibits D-3 and D-4.

500-17-118996-217                                                                PAGE: 19

complaints received pertaining to this issue and more importantly did not keep a return log. At trial, none of ByoPlanet's witnesses, including its experts, knew how many units (if any) had been returned as a result of this supposed defect. It is revealing that at trial, ByoPlanet could only produce 7 Promark Control Panels with damaged power cords returned from the field[112]. These panels were examined by ByoPlanet's expert who did not know where they came from nor to which complaint they were attached to, if any, the chain of custody not having been established.

[97]     The lists of complaints filed as Exhibits D-3 and D-4 were generated for the sole purpose of this litigation and compiled based on a key word search. They admittedly contain numerous duplicates[113] and relate to multiple issues, not necessarily to the alleged defect[114]. The only reliable log of returned items is the one kept by Promark and shared with ByoPlanet, which in total reveals 50 returned items over a period of 14 months[115]. This represents 2% of the Rolling Carts sold[116]. This extremely low return rate of the Promark products demonstrates that there is no actual loss of use or any premature deterioration of the products.

[98]     Second, ByoPlanet administered no evidence showing its own explicit policies or internal process when investigating alleged defects. The root cause analysis conducted in this case is more of a botched attempt to piece something together rather than a sophisticated, systematic, and elaborate process you would expect from a company dealing with Clorox products and who take their warranty obligations seriously.

[99]     Based on Cooper's testimony, he learned of this "serious defect" fortuitously, and took charge of the root cause analysis by "default". Not only is it difficult for the Court to understand whether this analysis actually yielded a true result, but ByoPlanet's most comprehensive report does not support its position. Quite the contrary.

[100]   The August 31, 2021, report reveals that the power cord failures identified from March to August 2021 were caused by user error and were solved by the addition of a strain relief cord[117]. Also noteworthy, the author of this report did not testify at trial. The only other testing conducted prior to this report was on August 18, 2021, and the results do not contain any conclusions regarding an overtightening of the gland in the Promark Control Panels[118]. As such, ByoPlanet's own internal investigation does not reveal that Promark's products were affected by any inherent defect nor that there was any premature deterioration or actual loss of use.

---

[112]  See Brosz Report, Exhibit D-17, p. 7.
[113]  Promark counted over 100 duplications repeating the same case numbers over and over again.
[114]  Exhibit P-27, U-19 and U-20.
[115]  The period of 14 months is from June 2020 to April 2021, as per the Return Log, Exhibit P-18. The evidence did not reveal whether the 7 Control Panels with damaged cords examined by the experts were included or not in the 50 returned items captured by the only Return Log, Exhibit P-18.
[116]  Exhibit P-18; 50 returned units + 23,349 sold units x 100 = 2 %.
[117]  Exhibits D-11 and D-27.
[118]  Exhibit D-6.

500-17-118996-217

[101]  Third, there is no written notice provided to Clorox of this "serious defect", despite ByoPlanet being contractually bound to do so[119]. Astonishingly, O'Shea testified that Clorox's policy was not to have any paper trail of any defects. This statement is not credible when one considers that it runs contrary to the parties' explicit contractual obligations.

[102]  However, even based on the limited information that was provided to Clorox by ByoPlanet regarding this alleged defect[120], it appears that Clorox was not concerned, let alone took any positive action such as recall, withdraw, or remove any of Promark's products[121]. In any event, since no Clorox representative testified at trial, the Court does not have any firsthand knowledge of Clorox's position on this matter, which is in and of itself, detrimental to ByoPlanet's allegations.

[103]  Furthermore, ByoPlanet itself took no action to rework any of the Control Panels in its possession despite its declared intent to do so on September 9, 2021. The absence of any evidence regarding a recall, or replacement of Promark's products is an important factor indicating an absence of a significant and actual loss of use.

[104]  Fourth, at that time, over 23,000 units incorporating Promark's allegedly defective Control Panels had been sold to Clorox and had been in the field for approximately one year. There were no reported safety issues or hazardous incidents. At trial, three years later, there is still no evidence of any such incidents. Keeping in mind that ByoPlanet is alleging a widespread and systemic defect affecting *all* of Promark's products which poses a safety hazard, the complete absence of any incident is very telling and reveals that there is no actual loss of use.

[105]  Finally, there is no mention of any defect issues with the 23,000 Rolling Carts in the field in the Wind Down Agreement signed with Clorox in December 2021, which indicates that ByoPlanet is responsible for warranty claims and replacement parts for previous products sold[122]. There is also no such mention in the Settlement Agreement signed by the parties putting an end to the Clorox Proceedings[123]. Again, if such a widespread and systemic issue did indeed exist, would ByoPlanet not have taken precautions in its termination agreements with Clorox, considering that it was still on the hook for warranty claims? The absence of any mention of a defect issue in the Wind Down Agreement demonstrates that this was not a live issue with Clorox.

[106]  The Court finds that a preponderance of the evidence leads to the conclusion that there is no actual loss of use of Promark's Control Panels.

---

[119]  Exhibit D-46, section 5.2.
[120]  The only written evidence of the information provided to Clorox regarding the alleged "defects" are Cooper's meeting notes of August 19, 2021, Exhibit D-8.
[121]  Exhibit D-46, section 5.2; Amended Cross-Application dated December 22, 2023, par. 23.
[122]  Exhibit D-45, sections 3.2. and 4.1.
[123]  Exhibit D-44.

[107]  Turning to the next question, has ByoPlanet proven the existence of a *likely risk* of a deficit in the usefulness Promark's products?

### 2.2.2  Likely Risk of a Deficit in Use

[108]  To answer this question, the Court can also consider the expert evidence adduced, but must nevertheless, take into account the time period elapsed since the products were put into the field. In other words, this analysis cannot be conducted in a vacuum, ignoring the fact that the 23,000 Rolling Carts have been in use for nearly three years.

[109]  The Court will conduct its review of the expert evidence in the following section. For now, even assuming that ByoPlanet's experts have proven an overtightening of the gland which could potentially lead to damage to the power cord, there is no expert evidence presented to the Court regarding the probable timeline that would be required for the power cord to actually show signs of damage once incorporated into the Rolling Cart units. Would it take one, two, three, four years for the alleged damage to occur to the power cord and lead to a malfunction or a premature deterioration of the unit?

[110]  This evidence is key since according to ByoPlanet, the complaints began in March 2021, so less than a year after Rolling Carts were in use. As such, following ByoPlanet's own reasoning, this defect surfaced rather quickly, approximately one year after the Rolling Carts were put into the field. However, three years later, there is no proof of any actual loss of use affecting the 23,000 Rolling Carts in the field and no explanation offered by ByoPlanet's experts as to this issue.

[111]  The Court also considers the fact that in accordance with the Wind Down Agreement, ByoPlanet would necessarily be aware of any such incidents since it is responsible for warranty claims and replacement parts[124]. Without such expert evidence as to a probable timeline of deterioration and considering the actual evidence adduced that the damage started to allegedly occur a year after the Rolling Carts were in use, the Court finds that there is no likely risk of a deficit of use of Promark's Control Panels.

[112]  Based on the above, ByoPlanet has failed to demonstrate that Promark's Control Panels malfunctioned or deteriorated prematurely thus engendering an actual or a likely loss of significant use, which would lead to the application of the presumption of liability.

[113]  Since the presumption of a liability does not apply, the burden rests with ByoPlanet to demonstrate that the Promark Control Panels are defective.

---

[124]  Exhibit D-45, sections 3.2 and 4.1.

### 2.3 If not, has ByoPlanet Established that Promark's Products are Otherwise Defective?

#### 2.3.1   Expert Evidence Adduced

[114]   In order to prove that the Promark Control Panels are defective, ByoPlanet relies primarily on its expert evidence:

a) Peter J.E. Brosz ("Brosz"), an electrical engineer who testified and provided a report dated October 12, 2022 (the "Brosz Report")[125]; and

b) Ivan Matijevic ("Matijevic"), an expert in materials science[126] who also testified and provided a report dated October 7, 2022. This is not a stand-alone report, as it forms an integral part of the Brosz Report[127].

[115]   Brosz examined 49 Control Panels in total:

a) 7 Promark Control Panels which based on information provided by ByoPlanet had been returned from the field with fractures in the cord jacket;

b) 37 new Promark Control Panels which had never been assembled into final units;

c) 5 new DK Control Panels which also had never been assembled into final units[128].

[116]   The Brosz Report provides that the root cause associated with the alleged power cord failures on the Promark Control Panels is the overtightening of the cable gland during assembly, which caused an over compression at the connection between the gland and the power cord. He states that 100 % of the Promark Control Panels examined were found to have the overtightened gland which could lead to damage to the power cord. He concludes by stating that the damage to the power cords caused by the overtightening of the cable glands into the cords causes an electrical safety hazard since the cords operate at 120 volts[129].

[117]   However, in order to identify the ultimate root cause, the Brosz Report relies on the Matijevic Report. Matijevic, after conducting a fractography analysis on one of the damaged Control Panels concludes that there is a premature overstress rupture of the power cords, when in combination with environmental factors[130].

[118]   Promark in turn relies on the expert report and testimony of Hugo Julien, a mechanical engineer who provided a report dated December 7, 2022 (the "Julien

---

[125]   Exhibits D-17, D-17.1 to D-17.8.
[126]   Materials science is a field which studies how materials are manufactured and behave.
[127]   Exhibit D-17.6.
[128]   Exhibit D-17, p. 7.
[129]   Exhibit D-17, pp. 25 and 26.
[130]   Exhibit D-17, p. 26, point 7.3; Exhibit D-17.6, p. 2.

Report")[131]. He examined 59 Control Panels in total, 26 new Promark Control Panels never incorporated into final units, 28 Control Panels already disassembled by ByoPlanet's expert, and 5 new DK Control Panels never incorporated into final units[132].

[119]   He finds that it is simply not possible to "overtighten" the gland because there is a stopper which prevents overtightening to occur[133]. He concludes that the damaged cords he examined cannot be caused by an overtightened gland but by misuse of the product by users. He does not see any damage to the cords on the new Promark Control Panels when compared to the DK Control Panels.

[120]   Regardless, Julien states that even assuming this was a real issue, it could have been remedied by loosening the gland and replacing the cord, a procedure that could be executed by the average assembly person[134].

### 2.3.2   Analysis of Expert Evidence

[121]   The Court finds that the expert evidence adduced by Promark is more credible and convincing than that of ByoPlanet. The fact that the Promark Control Panels show a gland that is more tightly screwed than the gland on DK's Control Panels only proves a different feature and not that there is a defect. In order to prove that the gland is indeed *overtightened*, one must begin by looking to ByoPlanet's specifications and to the manufacturer's gland requirements, in this case Beisit.

[122]   ByoPlanet designed the Control Panel that was assembled by Promark. In ByoPlanet's drawings, it requests cable glands to be plastic and to have a diameter of 4-8 mm[135]. It is uncontested that the Beisit glands used by Promark are plastic and had the required diameter[136]. There are no further instructions provided regarding the tightening of the gland nor any torque measurement requirement[137].

[123]   As for Beisit, both experts testified that the gland manufacturer also did not indicate a required torque measurement. Julien explains in his report that the only Beisit "requirement" he found stated the following: "Tighten the sealing nut to clamp the cable *firmly* in clockwise direction"[138]. He finds that both the Promark and DK glands located on their respective panels are "firmly tightened" and show no damage to the power cables[139].

---

[131]   Exhibit P-62.
[132]   Exhibit P-62, p. 4.
[133]   Exhibit P-62, p. 12.
[134]   Exhibit P-62, p. 12.
[135]   Exhibit D-1, p. 6.
[136]   Exhibit P-62, p. 6.
[137]   There are no further requirements regarding the tightening of the gland in the Bill of Materials provided by ByoPlanet to Promark for the Control Panels, Exhibit D-20.
[138]   Exhibit P-62, p. 5.
[139]   Exhibit P-62, p. 6.

500-17-118996-217

[124] Brosz does not contradict the Beisit requirement[140] but adds that the general applicable CSA standard for gland fitting provides that "a fitting shall be constructed to allow assembly to a cable or raceway as intended *without damaging the cable* (...)"[141]. Brosz then concludes that it was observed that the gland was overtightened which caused damage to the cords, thereby not respecting this standard.

[125] So, keeping in mind the absence of any torque measurement requirements, have ByoPlanet's experts demonstrated that the glands on the Promark Control Panels are overtightened and have caused damage to the power cord? The Court finds that the Brosz Report is not reliable.

[126] The issue is threefold.

[127] First, in order to claim that the gland is overtightened, proof must be made as to torque requirements which were not met or at least a design specification which was not respected. Both experts agree that this is not the case. All of the requirements, whether coming from ByoPlanet or from Beisit were met.

[128] Second, regarding the notion of "damage" to the cord, Brosz's conclusion is at best hypothetical since it only analyzed 7 Promark Control Panels which actually had damaged power cords, representing 0.03 % of the Control Panels in the field[142]. Since no return log was kept, the reasons leading up to the damaged power cords are unknown, given that ByoPlanet is incapable of retracing these 7 panels in its compiled lists[143].

[129] As such, the use of the term "damaged" by Brosz to qualify the power cords on all of the Promark Control Panels is problematic. What he has revealed is simply a difference in the tightening measurements of the gland between the DK and the Promark panels, nothing more[144]. To attempt to substantiate a claim that all of Promark's Control Panels had "damaged" power cords, they had to be placed under a specialized microscope, a digital zoom stereo microscope and, even then, he still had to seek the opinion of a specialist in materials science to establish an ultimate root cause of the damaged panels. Matijevic who after conducting a fractography analysis and using another specialized microscope known as a scanning electron microscope, concludes that the compression of the gland *in combination with environmental factors* creates conditions for environmental stress cracking ("ESC") of the power cord[145].

---

[140] Exhibit P-17, p. 8.
[141] Exhibit D-17, p. 21 and 22, CSA standard C22.2 No. 18.3.
[142] 7 ÷ 23 000 field units x 100 = 0.03 %.
[143] Exhibits D-3 and D-4. It is also unclear whether these 7 Control Panels are included in the 50 items captured in the Promark Return Log, Exhibit P-18.
[144] Measurements of the gland insert internal diameter once compressed were taken which revealed a difference between the two. Exhibit D-17, p. 17-19. DK's diameter measured 5.8 mm whereas Promark's was 3.72 mm.
[145] Exhibit D-17, pp. 1, 12, 26.

[130] The Court thus understands from ByoPlanet's experts that for the cord to eventually become damaged, environmental factors, such as cold temperatures, need to contribute. As already stated, the crucial element of a timeline for the occurrence of such a deterioration is not specified by either expert. These conclusions simply do not substantiate any inherent defect in the Promark Control Panels, but at best point to outside factors.

[131] Contrary to ByoPlanet's assertion, facts matter. A determination as to the defective nature of a product cannot be conducted in a vacuum, using abstract mathematical calculations, and ignoring the most important component—the factual evidence from the field.

[132] The probative value to be assigned to an expert opinion is directly related to the amount and quality of admissible evidence on which it relies[146]. In *La preuve civile*, Justice Catherine Piché summarizes this rule as follows:

> *Opinion fondée sur la preuve* – Le témoin expert ne se contente pas de dénoncer une opinion purement théorique, scientifique ou abstraite. Son opinion est fondée sur ses connaissances et son expérience, <u>ainsi que sur des faits qu'il a observés ou qui ont été légalement prouvés</u>.[147]

[Emphasis Added]

[133] ByoPlanet could only produce 7 Promark Control Panels with damaged power cords returned from the field. It is admitted that there were zero incidents reported where anyone's safety was compromised due to this supposed defect. There was no recall from Clorox. There was no reworking of any of Control Panels by ByoPlanet despite its declared intention to do so[148]. ByoPlanet's own internal investigation revealed that any issue that may have existed relating to power cord failures were attributable to user error[149].

[134] Keeping in mind that ByoPlanet's expert claims that 100 % of its Control Panel are affected by this systemic defect and pose a significant electrical hazard, how can there be almost no returns, no incidents reported, no actions taken by Clorox and by ByoPlanet itself? ByoPlanet's experts conducted a completely abstract and theoretical expertise not addressing any of the factual evidence nor considering the results of ByoPlanet's own internal investigation reports. This undermines ByoPlanet's experts' credibility and reveals that rather than addressing the elephant in the room, they chose to ignore it and draft a report that is dissociated with reality.

---

[146] *R. v. Lavallée*, 1990 CanLII 95 (SCC), [1990] 1 SCR 852, p. 897.
[147] PICHÉ, Catherine, *La preuve civile*, 5th Edition, Éditions Yvon Blais, Cowansville, 2017, par. 543.
[148] Exhibit P-19.
[149] Exhibit D-11.

[135] Thirdly, the Brosz Report devotes several pages to what he considers to be electrical safety hazards posed by the Promark Control Panels, going as far as to state that someone could be electrocuted if the copper wire strands are exposed[150]. During his testimony, he even recounted a story of a teenager getting electrocuted after touching exposed wires on an electrical panel in a garage, that had absolutely nothing to do with the current situation. These far fetched and alarmist conclusions are another demonstration of the abstract and theoretical nature of the report filed. They simply do not fit with reality. Confronted with the fact that in the last three years, there are zero incidents of this nature attributable to Promark's Control Panels, Brosz has no response.

[136] Overall, the Court finds that the Julien Report is more comprehensive and reliable than the Brosz Report.

[137] First, Julien's conclusion that it is not possible to "overtighten" the gland because of the existing stopper is consistent with the fact that both ByoPlanet and Beisit did not provide any torque measurement specification since evidently none was needed.

[138] Second, his conclusion that both the new DK and Promark power cords show similar local deformation enough to firmly secure the cable and reveal no damage is consistent with the fact that there have been no reported incidents in the field and no recall from Clorox.

[139] Third, his conclusion that the actual damaged power cords coming from the 7 Promark Control Panels are more likely attributable to user error, is compatible with ByoPlanet's own internal analysis and conclusions at the time.

[140] Finally, Julien's conclusion that even if an issue did exist, it could have been easily remedied, remains uncontradicted by ByoPlanet's experts. It is also supported by ByoPlanet's own email dated September 9, 2021, stating that it would be reworking the Control Panels already incorporated in the Rolling Carts finished units. This takes away any possible basis to argue that the "defect", even if did exist, was serious in nature.

[141] Based on the above, the Court finds that ByoPlanet has not proven that Promark's Control Panels are defective. The expert evidence does not support the conclusion of any inherent defect in the Promark Control Panels. As such, it has not established that there was a defect, nor that it was latent, sufficiently serious, existed at the time of the sale and unknown to it. On the contrary, a preponderance of the factual and expert evidence, establishes that there was no defect let alone that it was serious or latent, since Promark's products did not malfunction nearly three years after being put into the field.

[142] Given the Court's conclusion that ByoPlanet has established none of the required criteria to prove its latent defect claim, it is unnecessary to decide the question as to whether a timely notice was provided, as required by article 1739 CCQ.

---

[150] Exhibit D-17, pp. 22-25.

### 3.   IF NOT, WAS BYOPLANET ACTING IN BAD FAITH?

[143]   The evidence demonstrates that ByoPlanet conveniently raised the defect issue at the exact same time that it was experiencing serious cash flow problems and facing two major legal actions, in order to avoid paying the Outstanding Amount. The defect and the supposed loss of use were never seriously documented internally whether in a complaints/return log or in a serious root cause analysis.

[144]   First, O'Shea was livid when he discovered the existence of the Strategic Agreement and attempted to cancel it at the first possible opportunity. This demonstrates ByoPlanet's clear intent from the outset not to abide by its obligation to pay the Outstanding Amount.

[145]   This intent is further corroborated by the absence of any explanation regarding the unpaid five first installments due as per the Strategic Agreement. Promark's first email invoking the absence of payments is on July 20, 2021[151]. According to Cooper's testimony he became truly aware of the defect issue in August 2021. Why then were the five first payments provided for under the payment plan in the Strategic Agreement not made? There is no explanation offered by ByoPlanet.

[146]   On one hand, O'Shea testimony is contradictory on this issue, but ultimately, he states that he does not know. On the other hand, Cooper, and Corrigan both testified that they were completely in the dark as to the fact that significant amounts were owing to Promark when they sent their respective emails alleging defects and ultimately claiming the reimbursement of the purchase price[152]. So of course, they too had no explanation as to why the five first payments were not made, not even knowing the Strategic Agreement existed.

[147]   Rather, the missed payments totalling $ 400 000 USD were not made since ByoPlanet was having serious cash flow issues. ByoPlanet's August 31, 2021, bank statements reveal a balance of $ 336,503.76 USD, showing that cash flow availability was actually limited[153]. The $ 6 M USD RPMOS "loan" paid out from September 2021 to September 2022 also shows that ByoPlanet was lacking liquidities[154].

[148]   Second, and most importantly, there were simply no more orders from Clorox, the last one dating back to February 2021. So, ByoPlanet was stuck with thousands of products that it could not sell given its fractured relationship with its main client and partner.

---

[151]   Exhibit P-4.
[152]   Exhibit P-18, email from Cooper dated August 25, 2021, and Exhibit P-19, email from Corrigan dated September 9, 2021.
[153]   O'Shea refers to Exhibit P-37 which are ByoPlanet's redacted bank statements, and specifically to the one on page 21, which shows a balance of $ 336,503.76.
[154]   Exhibit D-31.

500-17-118996-217                                                            PAGE: 28

[149]  The relationship with Clorox was so damaged that it led to the institution of the Clorox Proceedings in July 2021 and ultimately to its termination by the end of the year. Another of its main suppliers, Gast was also unpaid and seeking to recover $ 1.8 M from ByoPlanet in proceedings instituted in July 2021.

[150]  The lack of orders combined with serious cash flow and litigation issues created an environment where ByoPlanet had to find a reason not to pay the Outstanding Amount that was clearly owing to Promark, or at least buy some time.

[151]  Third, over the 14 months (June 2020 to April 2021) that Promark sold and delivered the Assemblies to ByoPlanet, there were only 50 documented returns[155]; this was the process followed by the parties to identify issues with the items and they collaborated to resolve them. This process was not followed with regard to the "defect issue"[156]. ByoPlanet does not even know where the 7 Promark Control Panels with damaged cords examined by its experts came from.

[152]  Lastly, ByoPlanet never gave Promark the opportunity to study its root cause analysis, nor to remedy the supposed defect, contrary to the parties' contractual obligations[157]. It did not provide it with its August 31, 2021, report[158] nor did it inform Promark of Clorox's position that no recall would be conducted. Instead, on its own, on September 9, 2021, ByoPlanet conducted a "*de facto* recall" of the inventory held and mislead Promark stating that it would be "reworking" the Control Panels in inventory already incorporated into units and the ones that would be returned from the field[159]. It never "reworked" any of the Control Panels.

[153]  ByoPlanet's own inaction regarding this "serious defect", reveals that it simply did not take this issue seriously. This can be seen in the absence of any tracing regarding returns, its botched internal investigation, and its backtracking on reworking the Control Panels. It leaves the distinct impression that ByoPlanet was using the defect issue as a diversion and employing stalling tactics to avoid making payments that were clearly due.

[154]  A preponderance of the evidence reveals that not only are Promark's Control Panels not defective, but that the defect issue was raised to avoid paying the amounts clearly owing to Promark. As such, ByoPlanet acted in bad faith.

---

[155]  Exhibit P-18.
[156]  See also section 12 of the Strategic Agreement (Exhibit P-3), which was not respected.
[157]  Exhibit P-3, section 12.
[158]  Exhibit D-11.
[159]  Exhibit P-19.

## 4.    IS BYOPLANET'S CROSS-APPLICATION AN ABUSE OF PROCESS?

### 4.1 Legal Principles

[155]  Article 51 CCP allows the Court to declare a pleading or a party's conduct abusive:

> 51. The courts may, at any time, on an application and even on their own initiative, declare that a judicial application or a pleading is abusive.
>
> Regardless of intent, the abuse of procedure may consist in a judicial application or pleading that is clearly unfounded, frivolous or intended to delay or in conduct that is vexatious or quarrelsome. It may also consist in a use of procedure that is excessive or unreasonable or that causes prejudice to another person, or attempts to defeat the ends of justice, particularly if it operates to restrict another person's freedom of expression in public debate.

[156]  Article 51 CCP has a broad reach as to what is considered abuse and can also concern the nature or quality of the pleading. An abuse can arise from an application or pleading which is clearly unfounded. To the extent that article 51 CCP addresses an abuse of right in the pursuit of a right, then article 6 CCQ informs that the parties are bound to exercise their civil rights in accordance with the requirements of good faith[160].

[157]  The first paragraph of article 51 CCP appears to limit its application to the nature of an application or a pleading. However, the second paragraph clarifies and enlarges the scope of what is targeted by abuse of procedure.

[158]  The second paragraph defines abuse of procedure as consisting of (i) a judicial application or pleading that is clearly unfounded, frivolous, or intended to delay or (ii) conduct that is vexatious or quarrelsome or (iii) use of procedure that is excessive, unreasonable, causes prejudice to the other party or attempts to defeat the ends of justice. Attempts to defeat the ends of justice include a variety of situations, including where a party uses a procedure for the purpose of revenge or retaliation or for a disguised purpose having little to do with seeking justice[161]. These grounds apply regardless of the party's intent[162].

[159]  Article 52 CCP identifies the burdens which alternate between the parties. As the applicant, Promark has the burden to summarily establish that ByoPlanet's pleading is abusive. If Promark does summarily establish that abuse, the onus is then on ByoPlanet to show that its conduct was not excessive or unreasonable and was justified in law[163].

---

[160]  *Webb Electronics Inc.* v. *RRF Industries Inc.*, 2023 QCCS 3716, par. 58.

[161]  *Webb Electronics Inc.* v. *RRF Industries Inc.*, 2023 QCCS 3716, par. 59.

[162]  *Webb Electronics Inc.* v. *RRF Industries Inc.*, 2023 QCCS 3716, par. 216; *9218-4167 Québec inc.* v. *Bayview Financial, I.p.*, 2015 QCCS 6209, par. 84.

[163]  *Webb Electronics Inc.* v. *RRF Industries Inc.*, 2023 QCCS 3716, par. 63.

[160] Only an abuse of process and not on the merits can lead to the attribution of the legal fees incurred[164]. Article 54 al.1 CCP also allows the Court to award punitive damages, if warranted by the circumstances[165].

[161] Finally, the Court of Appeal reminds us that the Court must exercise caution prior to concluding that a situation constitutes an abuse of process and that the bar remains high:

> [126] L'article 51 *C.p.c.* couvre une panoplie de situations et le spectre de ces situations est large, mais, dans tous les cas, la barre est haut placée et elle doit le demeurer au risque de banaliser ce qu'est une procédure abusive et de constituer un frein à l'accès à la justice. <u>Les procédures manifestement mal fondées et celles qui ne visent qu'à faire taire l'autre partie doivent être sanctionnées.</u> Il en va de même de la partie qui utilise la procédure de manière excessive ou déraisonnable ou de manière à nuire à autrui. Mais, je le répète, <u>la barre de l'abus de procédure doit demeurer haut placée.</u> [166]

[Emphasis added]

### 4.2 Application

[162] Promark argues that ByoPlanet's Cross-Application constitutes an abuse of process since it is clearly unfounded[167]. There is no evidence of any defects in the Promark Control Panels and the legal bases of ByoPlanet's Cross-Application— resolution of the sale or subsidiarily, exception for non-performance, are manifestly unfounded. The most obvious unsurmountable obstacle being that ByoPlanet has not paid for the Control Panels for which it is asking the resolution of the sale and the "reimbursement" of the purchase price.

[163] In its Cross-Application, ByoPlanet is seeking $ 8,291,576.90 USD[168] broken down as follows:

a) The resolution of the sale for the approximately 39,667 (32,618 + 7,049) Promark Control Panels held in inventory *and for which ByoPlanet has paid for*;

---

164 *Viel* v. *Les Entreprises immobilières du Terroir Ltée*, [2002] R.R.A. 317 (C.A); *9083-8210 Québec inc.* v. *Paquette*, 2015 QCCS 4765, par. 42-43.

165 *Balabanian* v. *Cour du Québec*, 2023 QCCS 1636, par. 26-28.

166 *Biron* v. *150 Marchand Holdings inc.*, 2020 QCCA 1537, par. 126.

167 See conclusions of Promark's Amended Oral Grounds of Defence to Cross-Application dated November 21, 2023.

168 $ 10,915,031.83 CAD: see Amended Cross-Application dated December 22, 2023, par. 42 and Exhibit D-14 for the conversion rate as of September 7, 2022.

500-17-118996-217                                                        PAGE: 31

b) The restitution by Promark of $ 5,769,565.15 USD representing the *purchase price* of these Control Panels, based on a per unit cost of $ 145.45 USD;

c) Damages in the amount of $ 2,522,011.75 USD for the value of the ESP Power Supply and the ES-150 Sprayer, shipping costs and *rework costs*[169].

[164]  ByoPlanet admits that it cannot ask for the resolution of the sale nor the reimbursement of the purchase price for products it has not paid for. In fact, in its Cross-Application it continues to maintain that it has paid for *all* of the 39,667 Control Panels[170]. In actuality and while this is a flagrant contradiction with its own allegations, ByoPlanet admits to not having paid for at least 20,320 units out of the 32,618 held in inventory. It contends having paid for the 12,298 Control Panels not incorporated into finished units and 7,049 Control Panels incorporated in units but still held in inventory[171].

[165]  Thus, of the 39,667 Control Panels, ByoPlanet claims to have paid for 19,347 Control Panels representing 49% of the inventory claimed and has not paid for 20,320 Control Panels, so for 51%[172].

[166]  In other words, there is a judicial admission by ByoPlanet that it has not paid for over 51%[173] of the products for which it is claiming the resolution of the sale and the reimbursement of the purchase price. But did it actually pay for the remaining 49% of the Promark products?

[167]  ByoPlanet's assertion that it has paid for 19,347 Control Panels is based on the "first in, first out inventory method"[174] and not on any documented proof of payment administered at trial. It remains unexplained why ByoPlanet could not adduce proof of payment since at first glance, this would appear to be basic evidence.

[168]  Especially since simple math demonstrates that ByoPlanet's undocumented assertion does not hold up. Considering that the admitted Outstanding Amount owing to Promark is $ 5,419,173.89 USD and that the value of each Control Panel is $ 145.45 USD[175], it follows that the number of unpaid Control Panels is 37,257[176]. This number is very close to the 39,667 Control Panels for which ByoPlanet is seeking the resolution of the sale.

[169]  Therefore, it is not possible that ByoPlanet paid for the Control Panels it is claiming.

---

[169] Amended Cross-Application dated December 22, 2023, par. 41. ByoPlanet is also seeking "rework" costs that it has not incurred and has no intention of incurring.
[170] Amended Cross-Application dated December 22, 2023, par. 38, 41(a).
[171] Exhibit P-27, U-41; Amended Cross-Application dated December 22, 2023, par. 9.2 and 9.3.
[172] Amended Cross-Application dated December 22, 2023, par. 9.2, 9.3.
[173] 20,320 ÷ 39,667 = 51.23 %.
[174] Exhibit P-27, U-41; Amended Cross-Application dated December 22, 2023, par. 9.1.
[175] Exhibit D-2A; see also ByoPlanet's Brief of Arguments, dated December 14, 2023, par. 133(b).
[176] $ 5,419,173.89 USD ÷ $ 145.45 USD = 37,257 Control Panels.

500-17-118996-217

[170]   Regarding the exception for non-performance, this legal basis is also unfounded. In order to succeed on this basis, ByoPlanet had to demonstrate four conditions[177]: (i) the existence of a bilateral contract (art. 1380 CCQ), (ii) a substantial inexecution of Promark's contractual obligations, (iii) proportionality between Promark's inexecution and ByoPlanet's refusal to pay and (iv) good faith. Given the Court's conclusions that there is no latent defect affecting Promark's Control Panels, there is no substantial inexecution of Promark's contractual obligations. Moreover, since ByoPlanet acted in bad faith it is barred from invoking the exception for non-performance[178].

[171]   Applying article 52 CCP, the Court finds that Promark has proven summarily that the Cross-Application is abusive. ByoPlanet has not discharged its onus to show that the pleading and its conduct were not excessive or unreasonable and were justified in law.

[172]   ByoPlanet's unfounded Cross-Application unduly complicated a case that should have been a simple action on account, where the amounts were already admitted through an acknowledgement of debt. In a similar case, the Court of Appeal reminds us of the reprehensible behaviour that should be called out as an abuse of process:

> [9] Un « comportement blâmable » dans l'exercice d'un recours, c'est aussi, même sans mauvaise foi ou intention de nuire, <u>faire preuve de témérité, par exemple en formulant des allégations qui ne résistent pas à une analyse attentive et qui dénotent une propension à une surenchère hors de toute proportion avec le litige réel entre les parties.</u> En l'occurrence, il est certain qu'un <u>facteur aggravant tient au fait que de telles allégations ont été présentées en demande reconventionnelle dans le cadre d'un recours qui, envisagé de manière réaliste et pratique, avait la simplicité d'une modeste action sur compte</u>[179].

[Emphasis Added]

[173]   Here, ByoPlanet's behaviour is reckless (*téméraire*) and the Cross-Application can be viewed as an extension of the stalling tactics it employed when it invoked the defect issue to avoid paying Promark amounts that are clearly owing. The most revealing aspect of the abusive nature of the proceeding is the manifestly unfounded legal basis of its principal argument asking for the resolution of the sale for Control Panels it clearly did not pay for. This is a position that ByoPlanet maintained up until the end, even once the trial was completed[180].

---

[177]   Article 1591 CCQ; MOORE Benoit (dir.), *Code Civil du Québec Annotations—Commentaires 2022-2023*, 7th Ed., 2022, Yvon Blais, pp. 1510-1511.

[178]   *Portes et fenêtres Hickson inc. c. Mondou*, 2007 QCCS 2994, par. 38-40.

[179]   *El-Hachem v. Décary*, 2012 QCCA 2071 (CanLII) (QC CA), par. 9; *9218-4167 Québec inc. v. Bayview Financial, l.p.*, 2015 QCCS 6209, par. 84; *9083-8210 Québec inc. v. Paquette*, 2015 QCCS 4765, par. 59.

[180]   See Amended Cross-Application dated December 22, 2023.

[174] Moreover, considering the new facts brought to light regarding the Good Salt Transaction, it would appear that ByoPlanet is attempting to make itself judgement proof, thus demonstrating yet again its intent to use any means necessary to avoid paying the amounts it owes. While the Court was not tasked with determining whether Good Salt and O'Shea can be held liable for the monies owing to Promark, the facts put forward raise serious concerns, when one looks at the timing of this transaction, the fact that O'Shea is the principal and the directing mind of all of the implicated entities (ByoPlanet, Good Salt and RPMOS), and the minimal amount paid by Good Salt, at first glance, to acquire all of ByoPlanet's assets.

[175]    ByoPlanet is playing the clock and placing as many obstacles as it can in Promark's way, hoping time will run out, and that ultimately, Promark will give up on recovering the significant amounts it is owed. Simply put, it is attempting to defeat the ends of justice. This is exactly the type of conduct that article 51 CCP was meant to sanction.

[176]   In accordance with article 54 al. 2 CCP, since the amount of damages cannot easily be calculated at this time, the Court will allow the parties to present evidence on the issue of damages in a subsequent hearing.

## 5.    IS BYOPLANET'S CONFIDENTIALITY APPLICATION WELL-FOUNDED?

### 5.1 Context

[177]   In its Confidentiality Application, ByoPlanet is seeking permanent sealing orders regarding some of the exhibits filed[181]. At the Court's request, the parties provided a *Summary of the Parties' Positions with respect to the Documents to which Confidentiality and Sealing Orders Have Been requested* (the "Summary"). This Summary outlines some of the compromises made by the parties.

[178]   Most of the documents that ByoPlanet seeks to permanently seal are unredacted documents that were filed following the judgement rendered by Justice Urbas on November 3, 2023. They consist of two series of documents: (i) documents regarding the loan and security agreements with RPMOS and the foreclosure as well as two documents between RPMOS and Good Salt[182] (the "RPMOS Documents")[183] and (ii) the Share Exchange Agreement between Good Salt and Plandai (the "Plandai Agreement")[184].

---

[181]   Amended Application for a Sealing Order and for a Declaration of Substantial Breach in the Conduct of Proceedings dated November 21, 2023; Application for Confidentiality and Sealing Orders dated December 3, 2023.

[182]   Exhibits D-37, P-48 (PU-1bJ).

[183]   Exhibits D-31, D-32 (redacted), D-33, D-34, D-34A, D-35 and, D-36.

[184]   Exhibit P-48 (PU-1fA).

500-17-118996-217                                                    PAGE: 34

[179]  The last three documents that are the subject of the permanent sealing request are agreements with Clorox that ByoPlanet filed on its own initiative and have been heavily redacted (the "Clorox Agreements")[185].

[180]  In many instances, Promark has filed under its own exhibits, duplicates of the same documents[186]. Promark contests the request for a sealing order but has no objection to the redactions that have already been made. It does not contest the sealing order regarding the Plandai Agreement.

### 5.2 Legal Principles governing Confidentiality Orders

[181]  In *Sierra Club*, the Supreme Court of Canada reminds us that confidentiality orders should only be granted if:

a) such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and

b) the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings[187].

[182]  An "important commercial interest" cannot merely be specific to the party requesting the order; the interest must be one which can be expressed in terms of a public interest in confidentiality[188]. The existence of confidentiality provisions can be a sign that an important commercial interest is at play since the preserving of contractual confidentiality obligations can constitute such an interest, under reserve of the consideration of alternative measures to the confidentiality order[189].

[183]  Courts must nevertheless remain cautious in determining what constitutes an "important commercial interest". A confidentiality order involves an infringement on freedom of expression. Although the balancing of the commercial interest with freedom of expression takes place under the second branch of the test, Courts must be alive to the fundamental importance of the open court rule[190].

---

[185]  Exhibits D-44, D-45, and D-46. There are no duplicates filed by Promark.
[186]  Exhibits P-48 (PU-1bA), P-53 (U-6), P-48 (PU-1bD), P-53 (U-9), P-48 (PU-1bE), P-53 (U-7) unredacted, P-48 (PU-1bB), P-48 (PU-1BF), P-53 (U-2), P-48 (PU-1bG), P-48 (PU-1bH), P-48 (PU-1BI).
[187]  *Sierra Club du Canada* v. *Canada (Ministre des Finances)*, [2002] 2 RCS 522, par. 53.
[188]  *Sierra Club du Canada* v. *Canada (Ministre des Finances)*, [2002] 2 RCS 522, par. 55.
[189]  *Sierra Club du Canada* v. *Canada (Ministre des Finances)*, [2002] 2 RCS 522, par. 55.
[190]  *Sierra Club du Canada* v. *Canada (Ministre des Finances)*, [2002] 2 RCS 522, par. 56.

[184] "Reasonable alternative measures" can include the expungement of commercially sensitive content, and the filing of edited versions of the documents[191]. Moreover, a publication ban — less constraining on openness than the sealing orders — can also be a reasonable alternative, since such an order can restrict the dissemination of information to only those persons consulting the court record for themselves and prohibit those individuals from spreading the information any further[192].

[185] In *Sherman*, the Court recasts the test without altering its essence, helping to clarify the burden on an applicant seeking an exception to the open court principle, who must establish that:

    a) Court openness poses a serious risk to an important public interest;

    b) The order sought is necessary to prevent this serious risk to the identified interest because reasonably alternative measures will not prevent this risk; and

    c) As a matter of proportionality, the benefits of the order outweigh its negative effects[193].

[186] The test posed by *Sherman* places a heavy burden on the applicant seeking such orders and the Court must adopt a restrictive interpretation[194].

[187] Regarding settlement privilege, the leading authority remains *Sable Offshore*[195]. The purpose of settlement privilege is to promote settlement and to protect the parties' efforts to settle their disputes by ensuring that communications made in the course of those negotiations are inadmissible including the settlement agreement itself[196].

[188] As with other class privileges, there are exceptions. To come within those exceptions, a defendant must show that, on balance, a competing public interest outweighs the public interest in encouraging settlement[197]. In this regard, the following exceptions have been recognized: fraud, abuse of influence, preventing overcompensation of the claimant, the possibility of proving the existence or extent of the settlement, the need to resolve a statute of limitations issue or the need to explain or justify a delay in bringing a lawsuit[198]. Finally, a party may waive its right to benefit from

[191] *Sierra Club du Canada* v. *Canada (Ministre des Finances)*, [2002] 2 RCS 522, par. 63.

[192] *Sherman Estate* v. *Donovan*, 2021 SCC 25 (CanLII), par. 105.

[193] *Sherman Estate* v. *Donovan*, 2021 SCC 25 (CanLII), par. 38. The Court of Appeal granted leave in *Air Canada* v. *Choquette*, 2023 QCCA 1512 and should specify the *Sherman* test in the context of commercial documents. See also: *Raymond Chabot Grant Thornton* v. *Bourgeois*, 2021 QCCS 2933, par. 32. However, this does not change the essence of the criteria that must be met.

[194] *Raymond Chabot Grant Thornton* v. *Bourgeois*, 2021 QCCS 2933, par. 32.1.

[195] *Sable Offshore Energy Inc.* v. *Ameron International Corp.*, [2017] CSC 37; see also: *Union Carbide* v. *Bombardier*, 2014 SCC 35 at paras 31-34.

[196] *Sable Offshore Energy Inc.* v. *Ameron International Corp.*, [2017] CSC 37, par. 11-12.

[197] *Sable Offshore Energy Inc.* v. *Ameron International Corp.*, [2017] CSC 37, par. 12, 19.

[198] *J.J.* v. *Oratoire Saint-Joseph du Mont-Royal*, 2021 QCCS 2727, par. 47.

settlement privilege. Such a waiver may be explicit or implicit, but in the latter case, it must be clear and unambiguous[199].

### 5.3 Application

[189]  Here, regarding the first series of documents, the RPMOS Documents which include loan agreements, a security agreement and foreclosure documents, none of these documents contain a confidentiality provision. In addition, there is no important public interest identified by ByoPlanet regarding these documents, which in the context of insolvency proceedings would have been public anyways. Finally, the parties involved in all of these agreements, ByoPlanet, RPMOS and Good Salt are all controlled by O'Shea, so that we are not in a situation similar to *Sierra Club* where the orders sought were to prevent sensitive information from being provided to a competitor.

[190]  Regarding, ByoPlanet's bank statements, they have already been heavily redacted leaving only the minimal amount of information relating to this litigation. These redactions are not contested. However, the Court will order the removal of the unredacted duplicate copy filed by Promark, under Exhibit P-53, U-7.

[191]  For all of these documents, there is no compelling public interest requiring the permanent sealing order sought by ByoPlanet.

[192]  As for the Clorox Documents, they consist of the Settlement Agreement, the Wind Down Agreement and a Strategic Alliance Agreement that is no longer in force. All of these documents have been heavily redacted to only reveal the sections that are relevant to the Promark litigation. The Settlement Agreement[200] and the Strategic Alliance Agreement[201] contain confidentiality clauses. It is likely that the Wind Down Agreement also contains a similar clause but may have been redacted.

[193]  While the existence of confidentiality clauses does signal the potential of an important commercial interest that may give rise to an important public interest, the Court is of the opinion that the redactions made by ByoPlanet are sufficient to protect the parties' commercial information and therefore no permanent sealing order is needed. Moreover, the Strategic Alliance Agreement, which is dated September 30, 2020, has been terminated and so the exposure of the limited unredacted information that remains does not compromise any current important interest[202].

[194]  Regarding the Clorox Settlement Agreement, the Court notes that this agreement was filed by ByoPlanet of its own accord in order to prove the existence or extent of the settlement regarding the Clorox Proceedings. Under these circumstances, and considering the redactions made, the Court believes that settlement privilege does not

---

[199]  *Centre universitaire de santé McGill c. Lemay*, 2022 QCCA 1394, par. 28.
[200]  Exhibit D-44, section 5.
[201]  Exhibit D-46, sections 8.1, 8.2 and 8.3.
[202]  *Raymond Chabot Grant Thornton v. Bourgeois*, 2021 QCCS 2933, par. 79.1.

apply to this edited version of the document and that it falls within the exceptions cited above.

[195]   Another factor which weights in the Court's decision is the extent to which some of the information contained in the documents will already be in the public domain. The Court has relied on some of these documents to render its decision and has referred to them in this judgement, which will be public.

[196]   Applying the *Sherman* test, the Court finds that ByoPlanet has not demonstrated that Court openness poses a serious risk to an important public interest since no such interest has been identified, even if it had, reasonable alternative measures have been taken to expunge the documents of any unrelated information to prevent that risk and as a matter of proportionality, the benefits of the sealing order sought do not outweigh its negative effects.

[197]   Lastly, regarding the Plandai Agreement, which is completely unredacted, there is no confidentiality provision, and the agreement has since been rescinded by Plandai. However, since Promark does not contest this request and given that this agreement is with a third party unrelated to these proceedings, rather than issue a permanent sealing order, the Court will issue the less constraining measure, a publication ban, which restricts the dissemination of information to only those persons consulting the court record for themselves and prohibit those individuals from spreading the information any further.

## CONCLUSION

[198]   In conclusion, the Court finds that Promark's Originating Application is well-founded and that ByoPlanet has failed to demonstrate that it has any valid reason to avoid paying the amounts owing. The factual and expert evidence demonstrates that there is no inherent defect in the Promark products it sold and delivered to ByoPlanet.

[199]   Rather, in a context of limited liquidities coupled with a damaged relationship with its principal client and partner, ByoPlanet raised an excuse to delay payment and ultimately to avoid paying altogether by attempting to make itself judgement proof through a series of transactions. ByoPlanet's Cross-Application is an abuse of process. It is factually and legally unfounded and is an attempt to defeat the ends of justice. Its behaviour must be sanctioned under articles 51 and following CCP.

[200]   Finally, the Court also grants Promark's expert fees for the preparation of the Julien Report and his testimony at trial, in the amount of $32,112.11 CAD[203]. Julien's report and testimony were useful and relevant in deciding the outcome of the case[204]. The fees

---

[203]   Exhibit P-64.
[204]   *Maison Simons inc.* v. *Lizotte*, 2010 QCCA 2126, par. 40-46.

claimed are reasonable especially when compared to the fees incurred by ByoPlanet, which are over three times the amount ($119,432.69 CAD)[205].

**FOR THESE REASONS, THE COURT:**

[201] **GRANTS** Promark's Amended Originating Application dated November 22, 2023;

[202] **CONDEMS** ByoPlanet International LLC, to pay to Promark Electronics Inc. the sum of $6,745,787.66 CAD bearing an annual interest of 7.5%, plus the additional indemnity provided for under article 1619 of the *Civil Code of Quebec*, as of the date of the letter of demand, being August 3, 2021[206];

[203] **DISMISSES** ByoPlanet International LLC's Amended Cross-Application, dated December 22, 2023;

[204] **DECLARES** ByoPlanet International LLC's Amended Cross-Application, dated December 22, 2023, abusive within the meaning of articles 51 and following of the *Code of Civil Procedure*;

[205] **DECLARES** that pursuant to article 54 al. 2 of the *Code of Civil Procedure*, Promark Electronics Inc. may claim and prove its damages in a subsequent hearing;

[206] **ORDERS** that the Share Exchange and Reorganisation Agreement between Plandai Biotechnology Inc. and Good Salt LLC dated May 16, 2023[207] be the subject of a publication ban restricting the dissemination of information to only those persons consulting the court record for themselves and prohibit those individuals from spreading the information any further;

[207] **ORDERS** that Exhibit P-53, U-7 consisting of the duplicate unredacted copy of ByoPlanet Internal LLC's redacted bank statements filed under Exhibit D-32 be removed from the Court record;

[208] **THE WHOLE**, with legal costs, including expert fees in the amount of $32,113.11 CAD.

---

[205] *Lamoureux* v. *Organisme canadien de réglementation du commerce des valeurs immobilières (OCRCVM)*, 2024 QCCS 78, par. 10-28; Amended Cross-Application dated December 22, 2023, conclusions and Exhibits D-47 to D-49.

[206] Exhibit P-7.

[207] Exhibit P-48, PU-1(f)(A), consisting of 115 pages in total.

500-17-118996-217

PAGE: 39

_____
ELENI YIANNAKIS, J.S.C.

**Mtre Jason S. Novak**
**Mtre Carolyn Booth**
**Mtre Lara Assy**

Attorneys for Plaintiff Promark Electronics Inc.


**Mtre Erica Shadeed**
**Mtre Alexander Little**
**Mtre Abbie Buckman**
**Mme Lauren Manoukian (Stagiaire en droit)**

Attorneys for Defendant ByoPlanet International LLC


Hearing dates:     December 11, 12, 13 and 14, 2023


COPIE CERTIFIÉE CONFORME AU
DOCUMENT DÉTENU PAR LA COUR

_____
PERSONNE DÉSIGNÉE PAR LE GREFFIER
EN VERTU DE 67 C.P.C.

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT**
**IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. **CACE24005937**  DIVISION: **07**  JUDGE: **Tuter, Jack B., Jr. (07)**

**PROMARK ELECTRONICS INC.**

Plaintiff(s) / Petitioner(s)

v.

**BYOPLANET INTERNATIONAL, LLC**

Defendant(s) / Respondent(s)

_____/

**FINAL ORDER**

On February 20, 2025, the Court held an evidentiary hearing relating to an objection to domestication of a foreign judgment. The hearing consisted of introduction of agreed exhibits, argument of counsel and testimony from an expert for each side.

On May 10, 2024, Plaintiff in Execution and Judgment Creditor, Promark Electronics, Inc. filed a Motion for Proceedings Supplementary. Plaintiff posits it obtained a final judgment against Defendant, ByoPlanet International, LLC, from the Superior Court of Canada, Province of Quebec, District of Montreal on <u>March 12, 2024</u>.

Pursuant to section 55.604, Florida Statutes, Plaintiff recorded a certified copy of the Canadian Judgment in Broward County on March 18, 2024 together with an Affidavit for Recording Out-of-Country Foreign Judgment under Florida's Uniform Out-of-Country Foreign Money-Judgment Recognition Act. Plaintiff argues, pursuant to the statute, ByoPlanet had thirty days to file a notice of objection with the clerk of court, specifying its grounds for nonrecognition or non-enforceability. Plaintiff claims no objection was filed and on April 18, 2024, the clerk recorded the certificate.

As stated, in the May 21, 2024 Judgment, the Superior Court of Canada <u>on March 12, 2024</u> rendered its **First Judgment** finding ByoPlanet liable to Promark for $6,745,787.66 CAD. The Court also found that ByoPlanet's Cross-Application, for abuse of process was also well-taken. Plaintiff claims ByoPlanet did not appeal the March 12,

2024 judgment.

A subsequent hearing was held by the Canadian Court for reimbursement of attorneys' fees and punitive damages against ByoPlanet and its president Richard Patrick Michael O'Shea. Canadian law permits an action against a director of a company if the Court determines there was an abuse of process by the company. In the May 21, 2024 Judgment, the Court noted it was tasked with determining (1) the damages flowing from the declaration of abuse by ByoPlanet; and (2) whether the forced intervention of Richard Patrick Michael O'Shea, the Chief Executive Officer of ByoPlanet, should be ordered and whether he should be liable for attorney fees and punitive damages.

The Foreign Court granted Plaintiff's Fee Application by default, resulting in a **Second Judgment** (May 21, 2024) against Richard Patrick Michael O'Shea and ByoPlanet. In the 15-page Judgment, the Court determined that O'Shea should be forcibly impleaded since he is the principal and director of ByoPlanet and his reprehensible conduct was at the core of the abuse. The Court awarded Promark damages of $570,467.46 CAD in professional attorney fees and disbursements and $150,000 CAD in punitive damages. The Court held both ByoPlanet and Richard Patrick Michael O'Shea jointly and severally liable for the additional amounts.

The resulting objection by Richard Patrick Michael O'Shea relates **solely** to the $570,467.46 CAD judgment for attorney fees and punitive damages. O'Shea complains he was not afforded proper notice of the proceedings; was not afforded due process; and, the alleged notice he did receive was contrary to Canadian law.

However, at the hearing, O'Shea's counsel provided zero explanation why O'Shea did not appeal the judgment against him to an appellate court in Canada. Instead of pursuing his due process arguments in the appropriate forum he chose to raise them for the first time in Broward County. During the hearing it was clear O'Shea received notice of the proceedings in Canada. The Canadian Court made multiple findings relating to his many attempts to evade service of process. Finally, the Court permitted service via email which the evidence showed he read and even responded that he was attempting to retain an attorney.

As to the expert testimony, the Court accepts the expert testimony by Promark as

credible and rejects the expert testimony from ByoPlanet's expert.

O'Shea's many complaints should have been asserted in Canada. He chose not to appear at the hearing before the undersigned nor did he choose to testify. A reasonable inference from O'Shea choosing not to testify is that his testimony would not sufficiently support his due process claims.

The objection asserted by Richard Patrick Michael O'Shea is meritless and **OVERRULED**. The judgment creditor may proceed to collect the $570,467.46 CAD Final Judgment against Richard Patrick Michael O'Shea and/or ByoPlanet.

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>24th day of February, 2025</u>.

CACE24005937 02-24-2025 10:11 AM

CACE24005937 02-24-2025 10:11 AM
Hon. Jack Tuter
**CIRCUIT COURT JUDGE**
Electronically Signed by Jack Tuter

**Copies Furnished To:**
Alejandra Mercedes Iglesia , E-mail : aiglesia@bastamron.com
Alejandra Mercedes Iglesia , E-mail : eservice@bastamron.com
Alejandra Mercedes Iglesia , E-mail : mdesvergunat@bastamron.com
BYOPLANET INTERNATIONAL, LLC , Address : Genovese Joblove & Battista PA 100 SE 2nd St Fl 44 Miami, FL 33131
James M. Paul, Esq. , E-mail : Jpaul@nexuscapital.pe
James M. Paul, Esq. , E-mail : Jpaul@justicelawgroup.ai
James M. Paul, Esq. , E-mail : Jpaul@goodsaltlife.com
James Martin Paul , E-mail : service@bangenergy.com
James Martin Paul , E-mail : jamtau@aol.com
Jeffrey Bast , E-mail : jmiranda@bastamron.com
Jeffrey Bast , E-mail : jbast@bastamron.com
Michael S Perse , E-mail : mperse@klugerkaplan.com
Michael S Perse , E-mail : service@klugerkaplan.com
Michael S Perse , E-mail : miglesias@klugerkaplan.com

# EXHIBIT B

**Exhibit A: First Supplier Agreement**

## SUPPLY AGREEMENT

This Supply Agreement ("Agreement") is entered into effective as of April 25, 2020 ("Effective Date") by and between Byoplanet International, for its benefit and that of its subsidiaries) (Byoplanet International and its subsidiaries are collectively referred to herein as "Buyer") with an office at 1305 Shotgun Road, Sunrise, Florida, 33326, USA, and Promark Electronics Inc., for its benefit and that of its subsidiaries with an office at 215 Voyageur, Pointe-Claire, Quebec Canada H9R6B2 (Promark Electronics Inc and its subsidiaries are collectively referred to herein as "Seller").

This Agreement relates to the purchase and sale of products set forth below and incorporated herein and sets forth certain agreements of the parties relating to supply of such products.

Now, therefore, in consideration of their respective covenants and promises set forth herein, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

### Products

1) One (1) shipset shall be defined as, and include:

    a. 1pcs x Control Panel Assy: $200032$ REV $E$

        i. PCBA 200117 REV — *(INITAL RELEASE)*

    b. 1pcs x Electrostatic Power Supply (ESPS): 200081 REV — *(INITIAL RELEASE)*

    c. 1 pcs x Sprayer Control Panel: 200072 REV **C**

Final design documents to be provided to Seller by Buyer no later than April 29, 2020.

### Pricing & Freight

2) USD $175.00 (One hundred seventy five) per shipset
3) Pricing is fixed for the term of the agreement
4) Pricing is inclusive of packaging
5) FOB Promark, Montreal Canada
6) No NRE charges are applicable (with the exception of mold tooling if/as required for custom control panel as volumes increase, life of the tooling has been reached or dual sourcing is required)
7) Component attrition factored into pricing
8) No tariff surcharges will apply

### Quantity & Term

9) Quantity purchased and delivered shall be 200,000 (two hundred thousand) shipsets
10) The term of this agreement shall be 24 (twenty four) months
11) Purchase order to be provided subsequent to execution of this agreement.

### Payment terms

12) Deposits schedule as follows:
    a. $500,000 USD (five hundred thousand), paid April 30, 2020
    b. $500,000 USD (five hundred thousand), paid May 14, 2020
    c. $500,000 USD (five hundred thousand), paid May 28, 2020
13) Payment terms of Net 15 days upon shipment of shipset(s)

14) Payment terms shall be modified to Net 30 days once 80,000 shipsets have been delivered and payment terms of Net 15 have been respected regularly. If payment terms on the 80,000 shipsets delivered had been late by more than 5 days on more than 5 occurrences, payment terms shall remain Net 15 days for the duration of the agreement.
15) Payments are to be made by EFT (electronic funds transfer) or wire transfer.

**Delivery schedule:**

16) Buyer to provide schedule of deliveries for the term of the agreement by April 30, 2020.
17) Promark intends to build to finished goods stock to maintain a floating 7 days of stock, depending on production schedule received by Buyer.
18) Promark will ensure ability to flex volumes plus or minus 10% within [2] weeks of notice provided. This is also dependent upon material availability.
19) Buyer will provide Seller with firm delivery quantities (call-off) for a [30] day period against the production commitment.
20) Shipment frequency to be mutually agreed. It is anticipated that frequency will be one shipment per week, potentially moving to two shipments per week as volumes increase.

**Milestone dates:**

21) BoM review and approval complete by April 29, 2020, to allow sufficient time to receive materials.
22) ATP review and approval by May 8, 2020
23) Functional First articles (5 shipsets) by the week of May 25, 2020
    a. Components could purchased from Digi-Key (or similar) to accelerate validation of production process(es)
    b. Seller will require the support from Buyer to access custom parts, and other long lead items to produce first articles, to be mutually agreed, in order to achieve the date above.
24) First production delivery by the week of June 15, 2020.
25) Milestone dates are interdependent, and any deviations could result in later stages being affected.

**Miscellaneous:**

26) Seller to assume responsibility for sourcing all components required to produce a shipset, including but not limited to the control panel, motor-pump assy, and spray control panel lightboard from the following or alternate suppliers:
    i. Control panel (molded) – Gentry Plastics (North Carolina)
    ii. Motor-Pumps Assy – Welco (Japan)
    iii. Spray control panel lightboard – Genesis (China)
27) Shipset shall be noted as 'Made in Canada'.
28) Shipsets are custom products manufactured exclusively for use by the Buyer, and therefore this agreement and all products sourced and produced cannot be cancelled, modified or returned.
29) This Agreement shall be governed by and construed in accordance with the laws of the Province of Quebec, Canada. Any action or proceeding arising out of or related to this Agreement shall be instituted exclusively in the courts of Montreal and each party irrevocably submits to the exclusive jurisdiction of such courts.

THIS CLAUSE IS UNDER REVIEW BY COUNSEL. BY PLANET PREFERS ALL DISPUTES BE RESOLVED BY BINDING ARBITRATION IN A VENUE MUTUALLY AGREEABLE TO THE PARTIES OF THIS SUPPLY AGREEMENT. (AKJ- 04/28/20)

Page 2 of 3

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the date first set forth above, and confirm authority to bind the corporation.

BYOPLANET INTERNATIONAL

per: _____

Name: PETER JOHANSSON

Title: SVP OPERATIONS & STRATEGIC GROWTH

PROMARK ELECTRONICS INC.

per: _____

Name: Jarred Knecht

Title: President